**UNITED STATES of America,
Plaintiff,**

v.

**AMC ENTERTAINMENT, INC.,
American Multi–Cinema,
Inc. Defendants.**

**No. CV 99–01034 FMC(SHX).**

United States District Court,
C.D. California.

Nov. 20, 2002.

Leon W. Weidman, Michele C. Marchand, Suzanne L. Bell, Asst. U.S. Atty., Office of U.S. Attorney Civil Division, Los Angeles, CA, Bill Lann Lee, John L. Wodatch, Gretchen Jacobs, U.S. Department of Justice Civil Rights Division, Washington, DC, Dov Lutzker, Joseph C. Russo, Kathleen S. Devine, Phyllis M. Cohen, Devine S. Kathleen, Kristan S. Mayer, U.S. De-

partment of Justice Civil Rights Division, Washington, DC, for Plaintiff.

David C. Vogel, Robert J. Harrop, Raymond F. Beagle, Jr., Lathrop & Gage, Kansas City, MO, Gregory F. Hurley, Stacey L. Jaramillo, Paul F. Donsbach, Michael J. Mills, Tasia Marie Scolinos, Kutak Rock, Irvine, CA, for Defendants.

## ORDER ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT

COOPER, District Judge.

A movie-theater owner who provides wheelchair seating only in the front rows of the auditorium deprives persons with disabilities of equal access, benefits, and services in violation of the Americans with Disabilities Act. This rather unremarkable proposition has been the subject of extensive litigation and heated debate, culminating in the following Order.

This matter is before the Court on a number of motions. Oral argument was heard on November 18, 2002, at which time the parties were in receipt of the Court's summary of its tentative order.

Specifically, this Order resolves the following motions:

1) the parties' cross-motions for Partial Summary Judgment on the "Line-of-Sight" Issues (docket #346, 366); the Court **hereby grants** the Government's Motion, and **hereby denies** AMC's Motion;

2) the Government's Motion to Strike the September 26, 2002, Declaration of Gregory G. Hurley (docket #371), which the Court **hereby grants in part;**

3) the Government's Motion for Summary Judgment regarding Defendants' Affirmative Defenses (docket #379), which the Court **hereby grants.**

## I. Nature of the Case

This case arises out of the placement of wheelchair seating in Defendants' stadium-style theater complexes. The United States Department of Justice ("the Government") has filed suit against Defendants claiming that the placement of this seating denies persons with disabilities equal access, benefits, and services in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181—12189 ("ADA"). The Government is seeking declaratory relief, injunctive relief, compensatory damages on behalf of individual claimants, and imposition of civil penalties.

In resolving the issues currently before it, the Court interprets § 4.33.3 of the ADA Accessibility Guidelines, 28 C.F.R., Pt. 36, Appdx. A, which requires that wheelchair-bound patrons in assembly areas be provided with "lines of sight comparable to those for members of the general public."[1] The Court determines Defendants have violated § 4.33.3 in light of their wheelchair seating placement design. The Court also concludes the Government's articulated position on § 4.33.3 is worthy of the deference generally afforded administrative agencies.

Defendants' Motion for Partial Summary Judgment asks the Court to examine whether due process considerations preclude the Government's position from being applied retroactively. That Motion also concerns issues regarding Defendants' theater complexes that are located in the Fifth Circuit; the Fifth Circuit Court of Appeals has rejected the Government's position on § 4.33.3 in a similar but unrelated case. The Court concludes that due process does not preclude retroactive application of the Government's position, and that

---

**1.** *See* § V., *infra.* The Government has not moved for summary judgment regarding the application of § 4.33.3, because that inquiry would raise disputed factual issues regarding the "as built" seating configurations in the theaters at issue.

issues regarding the theater complexes located in the Fifth Circuit may be addressed in this action.

## II. Factual Background[2]

### A. The First Stadium–Style Theater Complex—The Grand

Defendant AMC Entertainment, Inc., and American Multi–Cinema, Inc., a wholly owned subsidiary of AMC (collectively referred to as "AMC"), are corporations with principal places of business in Kansas City, Missouri. AMC operates movie theaters throughout the United States. In 1995, AMC opened a twenty-four screen theater complex in Dallas, Texas, called the Grand Theater 24 ("the Grand").

The Grand was built according to a new type of theater design in which the majority of the seats were located in rows that had been placed on a series of flat, elevated risers or platforms, as opposed to a gradually sloping floor. The result is a series of tiered rows. In addition to the tiered seating, approximately 2—4 rows of seats in the front of each auditorium nearest the screen were placed on a sloped floor. Unlike traditional movie theaters, where all the seating is elevated through the use of a sloped floor and accessed by walking up or down an adjacent sloped aisle, the seats in the stadium-style section of the Grand can only be accessed by climbing up stairs to each of the risered-tiers. The seating platforms or risers at the Grand, and at other AMC stadium-style theaters, typically measure 12 to 18 inches in height and elevate each consecutive row of seats up to 18 inches above the immediately preceding row of seats. The entire tiered section of the auditorium is elevated above the sloped floor portion of the auditorium. This tiered-seating design is commonly referred to in the theater business as "stadium-style seating" or "stadium seating." The Grand was a financial success for AMC—breaking AMC's attendance records.[3]

### B. The Popularity of Stadium–Style Theaters

AMC's primary purpose in designing and constructing stadium-style theaters was to provide customers with enhanced, unobstructed lines of sight to the screen. AMC markets its stadium-style theaters as providing enhanced and elevated lines of sight that "change the way . . . moviegoers experience the movies." In press releases, advertisements, and other publicity materials, AMC has described stadium seating as providing "unobstructed viewing" through a tiered seating design that "virtually suspends the moviegoer in front of the wall-to-wall screen." The audience is thus "totally enveloped in the motion picture because of the enhanced sight and sound presentation" which, combined with unobstructed views of the screen, guarantees that "all seats" are the "best in the house."

---

**2.** The facts set forth below are uncontroverted, except as noted.

**3.** AMC objects to this evidence as irrelevant. AMC also objects to other evidence regarding the financial success of the stadium-style theaters as irrelevant. The Court has previously addressed this issue in its October 18, 2002, Order. AMC objected to discovery of financial information related to its stadium-style and traditional sloped-floor theaters. The Court held that such information was discoverable because comparative financial data could show increased per-seat revenue for stadium-style theaters over traditional sloped-floor theaters, which, in turn, could establish customer preference for stadium-style seating. Customer preference, of course, is relevant to determining whether wheelchair seating placement on the sloped-floor portion of a stadium-style theater is "comparable" to seating provided to the general public.

AMC's objections regarding the relevancy of the AMC's marketing materials that describe the enhanced "moviegoing experience" provided by stadium-style seating are also overruled for these reasons.

AMC's stadium-style theater complexes have proven to be very popular with the theater-going public who have attended these complexes in greater numbers than AMC's theater complexes with only traditional, sloped-floor theaters. In a recent annual report, AMC stated that these theaters have "become the industry benchmark" and that AMC's customers have "overwhelmingly embraced" the stadium-style theater concept. In addition, accordingly to this report, "[v]irtually every [stadium-style theater complex] that [AMC has] opened has become one of the industry's most successful in terms of attendance and film revenue."

Douglas Seibert, AMC's former Director of Construction for its Northeast and Southeast regions, has stated that the "public generally likes stadium theaters better than sloped-floor theaters." James Beynon, Senior Vice President and Treasurer for AMC stated that "the consumer prefers stadium seating." Overall, AMC's stadium-style theater complexes outperform its traditional sloped-floor theater complexes in terms of revenue, revenue per person, and/or attendance per screen. At the beginning of the fiscal year 1999, the average revenue per customer at a stadium-style theater complex, including ticket sales and concessions, was $6.90, whereas the average revenue per customer at a traditional style theater complex was $6.15. The average annual attendance per screen at the stadium-style theaters complexes was 68,000; the traditional-style theater complexes had 51,000 customers during the same time period.

All but one of the 83 AMC theater complexes that have been constructed or altered after May 1995 have incorporated stadium-style seating. As AMC adds new stadium-style theater complexes it has closed its older, traditional sloped-floor theater complexes. AMC plans to close nine traditional sloped-floor theaters, and for the next couple of years, expects to continue to close approximately nine or ten sloped-floor theaters per year.

Currently, AMC owns and/or operates 84 stadium-style theater complexes nationwide. These complexes generally contain between 12 and 30 screens. Shortly after the opening of the Grand, AMC opened several other stadium-style theater complexes, including the Promenade 16 in Woodland Hills, California, and the Norwalk 20 in Norwalk, California.

### C. Wheelchair and Companion Seating Placement

The wheelchair seating and companion seating in all but the four largest auditoriums at the Grand is located solely in the rows nearest the screen on the sloped-floor portion of the auditorium. None of the wheelchair seats or companion seats in these twenty auditoriums are located in the stadium-style section of the auditorium. The majority of the auditoriums at the Promenade 16 theater complex have similar wheelchair and companion seating placement in all but five theaters. The same is true of the wheelchair and companion seating placement in the auditoriums at the Norwalk 20 theater complex in all but three auditoriums.

Only 23.8% of AMC's stadium-style theater auditoriums nationwide have wheelchair seating located within the stadium seating section. Indeed, wheelchair seating is located in the very front row of 17.6% of the auditoriums, and over 30% of the theater complexes have at least one auditorium in which the wheelchair seating is located in the very front row.

In 2001, AMC began constructing and operating theater complexes with "full stadium" seating.[4]

---

**4.** Although not entirely clear to the Court, it

appears that the "full stadium" seating design

## D. Customer Complaints

Almost immediately after the opening of the Grand in 1995, customers with disabilities began complaining about the location of the wheelchair seating. For example,[5] wheelchair customers complained that they had poor views of the screen because of the close proximity of the screen; they complained about the requirement that they move their heads back and forth to follow the action on the screen. For disabled customers, this poor view was exacerbated by the fact that their wheelchairs do not recline, which required them to crane their necks back to see the screen. The poor view was also exacerbated by their inability (due to their disabling conditions) to move their heads from side to side repeatedly for the duration of the movie.

Bill Timper, AMC's former Vice President of Architecture, Planning, and Development, investigated the customer complaints. He visited the theater, and noted in an internal AMC memorandum shortly after his trip that the "rows on the sloped floor are the last to fill up, every time."

Additional complaints were received as AMC opened more theaters. In addition to the complaints lodged concerning the Grand, AMC received a complaint from a wheelchair-bound customer that she experienced severe neck and eye strain after watching a three and one half hour movie

("Titanic") from the third row of the theater. Another wheelchair-bound customer was unable to view the screen from the very front row of the theater because she would be required to crane her neck back to do so. This was not a feasible option for her, because her motorized wheelchair is controlled by a joystick that is located behind her head. This same customer also has difficulty hearing and often must read the character's lips to understand what they are saying, which is difficult to do from the front row of the theater. Another customer complained that parents sometimes leave their children unsupervised in the front rows, while they sit in "better seats." Other customer complaints have addressed the fact that the movie is grainy, distorted, and blurry from the front rows.

## E. Local Response to Theater Design

### 1. Promenade 16 in Los Angeles

In September 1994, AMC's architect STK Architecture, Inc. ("STK"), notified AMC that officials with the City of Los Angeles' Disabled Access Division of the Building and Safety Department had informed STK that its proposed design for the Promenade 16 theater complex would be rejected, because, among other things, the wheelchair locations in these theaters failed to "provide viewing alternatives similar to those of the general public." STK informed AMC that it would commence the appeals process "as soon as possible."[6]

---

may offer more options for wheelchair seating placement.

**5.** The Government has presented exhaustive evidence of customer complaints. Those complaints are merely summarized here.

**6.** In purporting to dispute this and other similar evidence, AMC states that if the Court considers this evidence, it should also consider the Government's review and approval of theaters designed by its expert, Peter H. Frink, with wheelchair spaces in similar areas. For instance, AMC contends that Frink designed theaters 1) that placed wheelchair

seating below the stadium seating in the back of a cross aisle where customers cross in front of the wheelchair spaces; 2) that placed wheelchair seating outside of the stadium seating area even if wheelchair spaces and their companion spaces were the only seats in the auditorium where views were interrupted by passing customers; and 3) that placed wheelchair seating in the first rows of an auditorium.

The Court does not see the relevance of this evidence. To the extent that AMC relies on this evidence to support its estoppel argument, AMC has presented no evidence that it

After the Promenade complex opened in March 1996, several members of the Los Angeles Commission on Disability publicly criticized AMC for ignoring the needs of disabled persons at this new complex. Panel members commented that the Promenade 16 failed to meet federal and state accessibility laws because, among other things, wheelchair locations were limited to the first two rows or the back of the theaters and had obstructed views of the screen.

### 2. Mission Valley 20 in San Diego

In January 1996, AMC met with officials from the City of San Diego's Code Compliance Department regarding the City's concern that wheelchair locations at AMC's Mission Valley 20 stadium-style theater complex were too close to the screen. The City placed a "hold" on AMC's final Certificate of Occupancy until the wheelchair locations were relocated to positions farther from the screen.

### 3. Fullerton 20

In June 1996, the ADA code consultant notified STK Architecture, Inc., AMC's architects for the Fullerton 20 theater complex, that the wheelchair locations were too close to the screen and needed to be placed so that the vertical viewing angle for customers in wheelchairs did not exceed 30 degrees.

### 4. Florida Hearings

In November 1996, Douglas Seibert, an AMC official responsible for overseeing AMC's ADA compliance in the Southeast Region, after sitting through two days of hearings before the Florida Board of Building Codes and Standards concerning AMC's accessibility waiver requests, stated in an internal AMC memorandum: "All Florida projects need some accessible seating in the stadium area. The '300 seat' rule AMC has been using is irrelevant because we do not offer 'comparable lines of sight.' " Seibert characterized his view of the wheelchair seating placement issue in this memorandum: "The accessible seating that we currently offer in stadium houses is an insult to the disabled. How often do you sit in the first, or even the fourth row?" Seibert concluded that "AMC may be very vulnerable to lawsuits in the stadium houses [it has] in Florida."

### F. A Scholarly View of Theater Seating

In 1838, Scottish engineer John Scott Russell published an article[7] entitled "Treatise on Sightlines and Seating," which has subsequently been described as "the first and still definitive statement on the subject of sight lines in modern theater design." George C. Izenour, *Theater Design* (1977). In this article, Russell specifically noted that certain seats have better sight lines than others and that one of the factors distinguishing seats with superior sight lines from those with inferior sight lines was whether or not a seat was "too far forward," such that it required a spectator to "look up at a painful angle of elevation" or whether a seat was "too far back." John Scott Russell, "Treatise on

---

relied on Frink's designs (or even that it was aware of Frink's designs) when it designed its own theater complexes.

AMC also points to evidence of what Frink considered "acceptable" wheelchair seating under the ADA. Frink's conclusion as to what designs are acceptable under the ADA constitutes a legal conclusion. The Court will draw its own conclusions of law.

**7.** In response to this evidence, AMC argues that nothing precluded the Government from incorporating the lessons of Russell's article into § 4.33.3. AMC notes that instead, the Government incorporated American National Standard Institute's document A117.1–1980.

Sightlines and Seating," *Edinburgh New Philosophical Journal,* Vol 27 (1838) (*see* United States Summary Judgment Appdx., Vol. 3, Exh. 82).

More recent treatises and publications have further discussed the factors that distinguish seats with superior lines of sight from those with inferior lines of sight. For example, a treatise published in 1964 cautioned that elevating the stage too much in an auditorium could adversely affect the quality of the viewing experience by "producing upward sight lines in the first two or three rows which are uncomfortable and unnatural for viewing stage setting and action." Harold Burns–Meyer & Edward C. Cole, *Theaters and Auditoriums* (2d ed.1964) (*see* U.S. Appdx., Vol. 3, Exh. 83).

In an article published in 1966, Rubens Meister discussed the existence of "iso-deformation" zones in movie theaters, within which the lines of sight to the screen were at such angles as to cause distortion of the visual image—i.e., where circles became ellipses, squares became rhombuses, and all shapes became distorted. *See* Rubens Meister, "The Iso–Deformation of Images and the Criterion for Delimitation of the Usable Areas in Cine-auditoriums," *Journal of the Society of Motion Picture and Television Engineers* 179–82 (March 1966) (*see* U.S. Appdx., Vol. 3, Exh. 84). Meister described three separate zones: (a) zone "i", in which image distortion would not be noticed; (b) zone "ii", in which distortion would be noticeable but tolerated; and (c) zone "iii", in which distortion would be sufficiently severe to cause viewers to reject those seats. *Id.*

Another treatise, published in 1977 by theater designer George Izenour, explained that the quality of the spectators' lines of sight is affected not just by whether there is a visual obstruction, but also by viewing angles: "A good sight line is one in which there are no impediments to vision, and angular displacement (vertical and horizontal) of the eyes and head falls within the criteria for comfort." George C. Izenour, *Theater Design* 4, 284 (1977) (*see* U.S. Appdx., Vol. 3, Exh. 82). Izenour noted that "distance and angular displacement" are among the types of "sight line problems" found in some auditoriums. *Id.*

Other authorities report similar parameters: that the maximum vertical viewing angle is between 30 and 35 degrees, 5 *Encyclopedia of Architecture* 81–83 (Peter H. Frink ed., 1989) (*see* U.S. Appdx., Vol. 3, Exh. 90); and maximum tolerable upward sight line angle for motion pictures is 30 degrees, Joseph DeChiara, "Theaters: Sight Lines," *Time–Saver Standards for Building Types* 404 (3d ed.1990) (*see* U.S. Appdx., Vol. 3, Exh. 91).

## G. SMPTE GUIDELINES

In or about June 1990, the Society of Motion Picture and Television Engineers ("SMPTE") published SMPTE Engineering Guideline EG 18–1989: *Design of Effective Cine Theaters.* (*See* U.S. Appdx., Vol. 3, Exh. 86). The SMPTE Guideline surveyed much of the existing literature discussing lines of sight and movie theater design and assembled from that literature a list of architectural parameters and criteria for designing an "effective" cine theater in which "everyone can see and hear well." *Id.* at 1. Several elements affecting a customer's viewing experience and lines of sight are set forth in the SMPTE Guideline: (1) image size; (2) image distortion; (3) visibility; and (4) comfort. *Id.* at 14. The Guideline recommends that the horizontal subtended angles created by a customer's lines of sight to the left and right edges of the screen be not less than 30 degrees. To minimize distortion, the SMPTE Guideline recommends that all seats be located in Meister's iso-deforma-

tion zones "i" and "ii". The SMPTE Guideline recommends that all viewers have an unobstructed vertical and horizontal sightline to the image on the screen. To maximize comfort, the SMPTE Guideline recommends that the nearest viewer's vertical line of sight should *not* exceed 35 degrees from the horizontal to the top of the projected images. Ideally, the sightline should be 15 degrees below the horizontal centerline of the image.

Larry Jacobson, AMC's former Senior Vice President for Design, Development & Facilities, testified that he established AMC's design criteria based in part on the SMPTE Guidelines in order to take into account such factors as horizontal and vertical viewing angles, distance from the screen, and screen distortion in order to maximize customers' viewing experience and comfort. Other AMC officials have acknowledged familiarity with, and/or reliance on, the SMPTE Guideline. Ralph Davis, AMC's Vice–President of Facilities, described SMPTE as the "basic standard we use for sight and sound." Richard Walsh, Chairman of the AMC Film & Marketing Group, stated that he has known about SMPTE Guidelines since he started with AMC 26 years ago. Sam Giordano, AMC's Senior Vice–President for Design, Construction & Purchasing, testified that AMC typically positioned first rows in theaters based on SMPTE Guidelines unless rows of seats needed to be added to the front of the theater "for seat count purposes for the film studios."

A representative of one of AMC's primary architectural firms, Gould Evans Affiliates, testified that the firm was familiar with these SMPTE standards and used them in part to establish design criteria for AMC's stadium-style theaters.

In 1994, SMPTE reapproved and reissued the guidelines in their entirety.

Two architectural reference books (one American and one European), in editions that were in existence at the time of the promulgation of § 4.33.3, set forth the same line of sight parameters that the SMPTE Guideline articulates with respect to the vertical angle to the top of the screen (no more than 35 degrees) and image distortion (seats must be placed within Meister's iso-deformation zones "i" and "ii"). C.G. Ramsey and H.R. Sleeper, "Theater Design Criteria," *Architectural Graphic Standards* 37 (Peter J. Frink 8th ed.1988); Ernst Neufert, "Theaters," *Architect's Data* 355 (Peter H. Frink 2d Int'l ed.1980) (*see* U.S. Appdx., Vol. 3, Exh. 88, 89). A representative of Gould Evans Affiliates testified that the firm relied on *Architectural Graphic Standards* when developing design criteria for AMC's stadium-style theaters, including the Grand 24.

## H. Lucasfilm Guidelines

In 2000, Lucasfilm issued "guidelines for the operation of motion picture theaters" that cited to the SMPTE Guidelines (1994 ed.) for the maximum vertical sightline angle (35 degrees), the maximum horizontal subtended angle (26 to 36 degrees), and the recommended image distortion boundaries (Meister's 45 degree iso-deformation boundaries). Lucasfilm, "THX Theatre Alignment Program: Recommended Guidelines for Presentation Quality and Theatre Performance for Indoor Theatres" at 9 (2000) (*see* U.S. Appdx., Vol. 3, Exh. 92).

## I. National Association of Theater Owners ("NATO")

The National Association of Theater Owners ("NATO") is a trade organization for motion picture theater operators. Its membership includes the owners and operators of more than 10,000 motion picture screens across the United States, including many of the largest exhibitors in the nation and the world. NATO actively lobbies

and advocates on issues affecting its membership. For at least the last eleven years, it has utilized the services of attorney/lobbyist Steven Fellman.[8] AMC was a member of NATO until approximately 2000. In the late 1990s, AMC was the NATO member with the largest number of screens.

On or about March 1991, NATO submitted comments regarding a proposed draft of the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), to be issued by the United States Architectural and Transportation Barriers Compliance Board ("the Access Board") pursuant to the ADA. In its comments, NATO stated: "Sight lines are normally determined based on computations from the last row in the theatre so that the sight lines from the last row seats are the best in the house."

On or about July 6, 1992, Fellman transmitted a letter to the Government on behalf of NATO, in which he stated that "line of sight is usually considered in terms of degrees.... Indeed, the degree of line of sight will vary from seat to seat in a motion picture theatre and also vary from within any given seat to various portions of the screen." On or about November 11, 1992, Fellman transmitted a letter to the Government on behalf of NATO with which he enclosed drawings that "demonstrate lines of sight" in a typical theater. The drawings show a "red cone" depicting viewing angles in the theater. The accompanying letter states: "Seating in the rear of the auditorium affords the smallest viewing angle and thus is the best for a patron with limited flexibility."

On or about September 7, 1993, NATO transmitted a letter to North Carolina State University commenting on a draft report prepared by the University concerning accessibility in public assembly areas. In its letter, NATO stated that seats in the rear of a movie theater have the "best" sight lines and that most wheelchair customers would take the position that wheelchair seating in the front row is "undesirable."

On or about January 27, 1994, NATO issued a document entitled "Position Paper on Wheelchair Seating in Motion Picture Theatre Auditoriums." In its position papers, NATO stated: "In motion picture theatres, unlike other auditoriums, the most desirable seats, and in fact the seats first chosen during most performances, are those in the rear third of the theatre." NATO further stated that "lines of sight are measured in degrees." (*See* U.S. Appdx., Vol. 3, Exh. 98).

On or about February 2, 1995, NATO submitted an amicus brief in the case of *Fiedler v. American Multi–Cinema, Inc.*, No. 92–486 (D.D.C.), an ADA lawsuit involving a traditional sloped-floor movie theater. In its brief, NATO stated that seats in the rear of a movie theater have the best sight lines and are the "most favored," that seats in the front are the "least desirable," "the last to be taken," and that "lines of sight are most commonly measured in degrees."

In or around March 1995, Fellman wrote an article in NATO's monthly newsletter to its members reporting on the *Fiedler* litigation. Fellman characterized the arguments made in the *Fiedler* amicus brief: "We further explained that if one was discussing sight lines, one would reference angle rather than slope."

On or about September 29, 1995, Fellman, on behalf of NATO, transmitted a memorandum to the Access Board's

---

8. AMC objects to evidence regarding NATO on the basis of relevancy, arguing that the Government has barred AMC from discovery relating to the Government's negotiations with NATO on the basis of privilege and relevancy. The Government is not offering any evidence regarding its negotiations with NATO. AMC's objections are overruled.

ADAAG Review Advisory Committee, which stated that the "best sight lines" and the "most desirable seats" are normally in the rear of movie theaters.

On or about January 16, 1998, Fellman wrote an article for NATO's monthly newsletter to its members noting: "Stadium-style seating continues to present major problems for theater owners." After noting complaints from "disability rights groups," Fellman urged theater owners to place a folding chair in one of the wheelchair spaces and watch a movie from there. Fellman suggested that the experience of a customer sitting in that space is not typical of other customers in the theater.

In 2000, NATO changed its position with respect to the appropriate interpretation of the comparable-lines-of sight requirement of § 4.33.3. In response to the Access Board's 1999 notice of proposed rulemaking, NATO argued that " '[c]omparable lines of sight' should be determined by evaluating the ability of a person in a wheelchair to see over the head of the person in front, as compared with the ability of person in the row in front of the wheelchair space and the person in the row behind the wheelchair space to see over the head of the person in front of him or her." (*See* U.S. Appdx., Vol. 3, Exh. 105).

## J. AMC's Position in Previous Litigation Regarding Line of Sight

In a memorandum filed in the *Fiedler* litigation, AMC argued that § 4.33.3 should be read to include viewing angles: "Lines of sight for a patron in the auditorium are measured with reference to the horizontal and vertical angles of view the eye must encompass in seeing the screen. . . . It is self-evident . . . that . . . sight lines are steepest in the front and flatten out in moving to the rear." (*See* U.S. Appdx., Vol. 3, Exh. 108).

## K. AMC's Architect's Understanding of Lines of Sight

Representatives from AMC's architectural firms, STK and Gould Evans Affiliates have acknowledged that the meaning of "line of sight" is not limited to "unobstructed view." A representative of STK acknowledges that a sight line has many components, including reference to angles from a viewer's head to a focal point. A representative of Gould Evans Affiliates admitted that the term "line of sight" encompasses viewing angles, that a sightline analysis includes an assessment of viewing angles, and that AMC was considering viewing angles as early as 1995 when locating the first row of seats relative to the screen.

## L. Jacobson's "Comfort Zone"

In 1993, Larry Jacobson, AMC's former Senior Vice President for Design, Development & Facilities, gave a speech on behalf of AMC, entitled "Designing for the Comfort Zone," to an association of theater equipment suppliers. In this speech, Jacobson described designing for the "comfort zone" as "presenting the audience with the most comfortable total environment possible, so that they can fully enjoy the illusion and be completely mesmerized." (*See* Jacobson Depo. at 92–114). According to Jacobson, designing for the "comfort zone" required attention to such design considerations as vertical viewing angles, horizontal viewing angles, head clearances (obstructions), screen size and distance relative to the first and last rows in the auditorium, and SMPTE's iso-deformation guidelines. Jacobson admitted that the majority of wheelchair seating at the Grand 24, Norwalk 20, Promenade 16, Mission Valley 20, and Arrowhead 14 theater complexes were outside the "comfort zone" and provided less than ideal viewing experiences.

Jacobson testified that he established AMC's design criteria to take into account such factors as head clearances (obstructions), horizontal and vertical viewing angles, distance from the screen, and screen distortion in order to maximize customer's viewing experience and comfort. Jacobson testified that he designed the Grand 24 based in part on the foregoing architectural principles. When these design criteria are not followed, Jacobson stated that seats located too close to the screen (with consequently large horizontal or vertical viewing angles) would (1) make it difficult to view the entire image; (2) cause images to appear distorted and overwhelmingly large; (3) cause customers to "break their necks"; and (4) would make watching a movie like watching a tennis match because a customer would need to move his or her head from left to right to follow the action on the screen. Other AMC officials noted similar problems with seats located too close to the screen. (*See* Giordano Depo. at 63–64; McDonald Depo. at 141–144; Keppler Depo. at 43–44, 92–93; Seibert Depo. at 60–62).

Jacobson testified that there is a "design point" in AMC's stadium-style theaters that is typically located one-third of the way back from the screen and within the stadium-style section. From this design point to the back of the auditorium, there is nice presentation with "optimal viewing" that is generally free of image distortion or physical discomfort and that immerses the customer in the film presentation. The seats are non-optimum in front of this design point, and offer views of the screen that are less relaxing, more uncomfortable, more distorted, and have overly large projected images. Jacobson admitted that the seats located in the front of the design point are placed there to "fill up" the theater. Jacobson stated that the viewing experience for customers seated in front of

the design point are "god awful". Jacobson characterized these seats as "booker seats"; i.e., "extra" seats placed in the front of the theater for revenue purposes only that have less than optimal views of the screen.

Other AMC officials similarly testified that the middle portion of the stadium-style section is generally considered to offer the "best" and most preferred seats in the theater. (*See* Giordano Depo. at 125–26; Pennington Depo. at 181–182).

**M. AMC Officials Regarding Lines of Sight**

Other AMC officials have also agreed that the term "lines of sight" or "sight lines" includes viewing angles.[9] (*See* McDonald Depo. at 112–113; Seibert Depo. at 80–82).

Seibert admitted that lines of sight can be qualitatively compared and that, "as a matter of geometry," there are better and worse sight lines to the screen. He also admitted that lines of sight generally improve the farther a spectator is from the screen. Seibert testified that wheelchair seating located on the traditional sloped-floor portion of AMC's stadium-style theaters does not have the benefits of the "better" sight lines afforded seats in the stadium-style portion of the theater, and that the lines of sight from the floor have "inferior" sight lines.

**N. Customer Seat Preference**

In stadium-style theaters, most members of the public can, and do, sit in the stadium-style seats. Government counsel has aptly characterized this phenomenon as "[t]hose who can, vote with their feet."

During discovery in this action, the Government conducted a court-ordered inspection of several of AMC's stadium-style theater complexes nationwide. As part of

**9.** AMC's objections to this evidence on the basis of relevancy are overruled.

these inspections, the Government video-taped customers [10] entering theaters and choosing their seats in a representative sample of theaters selected by Dr. Linda Fidell, an expert statistician retained by the Government. (*See* Fidell Report, April 9, 2002, attached as Exh. 109 to the U.S. Appdx., Vol. 3). A total of 1088 tapes (averaging about an hour in length) were made of customers as they attended 67 different movies.[11] From the 1088 video-tapes, Dr. Fidell selected a representative sample of 185 tapes (or 17%) for analysis. The sample accounted for such variables as day of the week, time of day, movie rating, and theater size. Twelve digital images, at three-minute intervals, were then extracted from each selected video tape for analysis. These images started at approximately 24 minutes before the movie screening and continued until approximately three minutes after the lights dimmed.

Dr. Fidell's analysis revealed that AMC customers substantially prefer the seats in the stadium-style section to seats outside the stadium section—whether on the sloped-floor or the "mini-risers" in front of the stadium section—where most of the wheelchair seating is located. This preference ranged from 66.3% to 100%. The wheelchair seating was located in areas where only 5% to 6% of movie customers chose to sit. The exact preferences varied based on the size of the theater. Based on her analysis, Dr. Fidell concluded that 76% of the wheelchair seating locations in the

large theaters analyzed, and all (100%) of the wheelchair locations in the medium and small theaters fell outside the pre-ferred seating area.

## O. AMC Official Seating Preferences

AMC officials testified that they do not prefer to sit in the front of the theater. (*See* Seibert Depo. at 76; Jaquay Depo. at 128, 130; Keppler Depo. at 92–93).

## P. Wheelchair Customers' Subjective Experiences

In addition to evidence regarding wheel-chair-bound customers' inability to enjoy the superior viewing angles afforded by the stadium-style seating, the Government has also presented evidence that wheel-chair-bound customers experience other conditions that detract from their moviego-ing experience. These customers report that they suffer from a sense of embar-rassment and isolation from being relegat-ed to a section of the theater where no one else is sitting. Other customers have de-scribed feelings of anger and humiliation, or report a feeling of being watched be-cause everyone else in the audience is behind them.

## Q. AMC's Evidence Offered in Support of Its Motion for Summary Judg-ment

In January 1992, Marc Fiedler filed suit against AMC claiming that AMC's place-ment of wheelchair seating in its sloped-floor theaters violated the ADA.[12] The

---

**10.** In order to preserve audience privacy, the Court's Order prohibited the Government from making audio recordings during the the-aters' operational hours. The Order also re-quired the Government to use digital or ana-log technology to blur or otherwise obscure the faces of the persons appearing in the videotapes. (*See* Court's June 16, 2000, Or-der at 6).

**11.** AMC objects to the use of the evidence derived from the tapes and the Fidell Report

because the Government has not yet provided copies of the tape to AMC. Evidence of record establishes that the videotapes were made available to AMC's counsel within the time frame allowed by the Federal Rules of Civil Procedure. AMC's objection is overruled.

**12.** AMC contends that the *Fiedler* litigation advocated placing wheelchair seating "in the front of an auditorium." This statement is simply wrong. The Complaint in the *Fiedler* action reveals that the plaintiff alleged that

Government filed an amicus brief that generally supported Fiedler's claims.[13]

In March 1996, the Government was party to a consent decree issued in *Arnold v. United Artists*, in which the defendant theater owner was required to place at least two wheelchair spaces in each theater, located at a distance at least one-fourth of the way away from the screen and no more than three-fourths of the way away from the screen, but in no instance could a wheelchair space be closer to the screen than the fourth row.[14]

In March 1997, Joe Russo, a trial attorney with the United States Department of Justice ("the DOJ"), gave a presentation to theater owners, including AMC, on the requirements of § 4.33.3.[15]

---

AMC violated the ADA by failing to disperse wheelchair seating spaces throughout the seating area in several of its theaters. The plaintiff alleged that all the wheelchair seating was in the back of the theater, and stated that he wished to sit near the middle of the theater. (*See* U.S. Opposition Appdx., Exh. 19).

13. AMC contends that, as a result of the Government's amicus brief, it positioned the wheelchair seating in its stadium-style theaters in the front. AMC has presented no evidence regarding this fact. The sole evidence offered in support of this proposition is the conclusory declaration of AMC's counsel of record, Gregory F. Hurley. Counsel is not competent to give evidence on substantive matters at issue in this case. Additionally, Hurley's declaration directly contradicts the deposition testimony of'Jacobson, who testified that AMC was so focused on developing and refining the stadium concept in its early stadium-style theaters, that the placement of the wheelchair seating locations on the sloped-floor portion of the theater was essentially an afterthought. (Jacobson Depo. at 138, 142–43, 175–76).

14. In the Statement of Facts, AMC's counsel mischaracterizes the *Arnold* consent decree as establishing a type of "fourth row" rule. The standards for wheelchair seating set forth in the consent decree were not so simple, and to maintain otherwise is disingenuous. The consent decree clearly established that the wheelchair seating should be placed in the middle half of the theater (one-quarter to three-quarters of the way away from the screen), but in no instance should the wheelchair seating be closer to the screen than the fourth row. To maintain that this position is equivalent to a per se "fourth row" rule is intellectually dishonest and insulting to this Court.

AMC's counsel's declaration states that, in response to the *Arnold* consent decree, AMC modified its plans to ensure that the wheel-

chair locations were no closer than the fourth row of the theater. This evidence is not admissible. Counsel of record may not testify regarding substantive matters.

Additionally, counsel's declaration contradicts the testimony of AMC officials. The admissible evidence of record establishes that AMC modified its written design criteria in 1996 to state that wheelchair seating should not be located closer than the fourth row. However, in practice, this design criteria resulted in AMC simply adding additional rows in front of the first row in the theater, which violated AMC's own standards for the minimum distance away from the screen for front-row seating, in order to make it appear that the wheelchair seating was located in the "fourth row" of the theater. Additionally, there is some evidence that AMC on occasion ignored its own design criteria and placed the wheelchair seating in the first, second or third rows.

15. AMC quotes selectively from the transcript of the meeting in an attempt to bolster its argument that the Government should be held to its previously stated position regarding § 4.33.3. The transcript reveals that on least two occasions, Russo specifically stated that the DOJ was not taking a position on § 4.33.3. Russo stated: "So, we're not going to take any long-term lasting positions on what we think is required today." (Tr. at 75, attached to U.S. Opp. Appdx. as Exh. 23). Russo also more succinctly stated: "I'm not taking any position at'all for the Department today." (*Id.* at 29).

Moreover, referring to wheelchair seating placement, Russo articulated a position that is not inconsistent with the Government's position in this case: "If you put people in the front—and let's not all chuckle—but these are not the first seats that go when you go to the movies. Nobody runs into the movie theater to see Terminator 200 and runs to the front

In 1998, the Government filed an amicus brief in *Lara v. Cinemark, U.S.A.*, No. EP–97–CA–502–H, 1999 WL 305108 (W.D.Tex.1999). In *Lara,* Cinemark advocated an interpretation of § 4.33.3 that equated "lines of sight" with "unobstructed view" and nothing more. The United States advocated a different interpretation:

> "[L]ines of sight" are described by the movie industry itself, and this concept provides a way of measuring the quality of the movie viewing experience.... The vertical field of vision (to the top and bottom of the screen), horizontal field of vision, and other similar factors are measured to ensure that the viewer has a line of sight that approaches an optimal viewing zone.... These same factors are used to determine whether the viewer has a line of sight that results in physical discomfort.... Once measured, the lines of sight provided to wheelchair users must be comparable to those provided to members of the general public. "Comparable" is an ordinary word used in everyday parlance.... Wheelchair locations should not be relegated to the worst sight lines in the building, but neither do they categorical-

ly have to be the best. Instead, consistent with the overall intent of the ADA, wheelchair users should be provided equal access so that their experience equates that of members of the general public.

(*See* AMC's Motion, Exh. H, at 7–8).

AMC's counsel's declaration states that in response to the *Lara* brief, AMC changed its design criteria to require that wheelchair spaces be placed in the stadium seating area and that they provide specific viewing angles to the top of the screen. AMC officials tell a different story.[16]

Twelve of the eighty-three complexes at issue in this action are located in the Fifth Circuit.

### R. The Present Action

In June 1998, the Government informed AMC that its theaters with stadium-style seating violated Title III of the Americans with Disabilities Act, and that if the parties were unable to reach a negotiated agreement, the Government would file an enforcement action. Between June 1998 and January 1999, the Government and

seat so they can get neck strain like this." (*Id.*)

**16.** The declaration of AMC's counsel of record regarding this issue is not admissible. AMC officials and architects gave other reasons for the design changes. Timper testified that wheelchair seating was integrated in the stadium-style area of the theater as a result of a Florida architectural charette and that the vertical viewing angles were established by AMC as a result of settlement negotiations with the DOJ in 1999 (Timper Depo. at 243–45, 287); Singleton testified that "all-risered" or "full stadium" theaters were always on AMC's "wish list". (Singleton Depo at 69, 95). Troutman testified in his Rule 30(b)(6) deposition that he recalled vertical viewing angle discussions since the filing of the DOJ's lawsuit (Troutman Depo. at 177–18). Giordano testified that the full-stadium seating de-

sign adopted by AMC in February 1999 came about to keep ahead of the competition and arose out of DOJ litigation. (Giordano Depo. at 259–60). Pennington testified at his Rule 30(b)(6) deposition that he had no recollection of when AMC adopted internal criteria regarding vertical viewing angles or the date when AMC received copy of *Lara* brief (and that he would be the individual at AMC who would receive such a brief). (Pennington Depo. at 84–85, 339–40). He also testified that AMC's vertical viewing angle criteria arose out of a discussion with the California State's Architecture Office, and AMC believed that a 30–degree maximum vertical viewing angle would thereby provide a "safe haven" for compliance with § 4.33.3. (*Id.* at 90–93, 115–116). Pennington further testified that AMC went to "full stadium" seating for all customers in order to make the front rows easier to sell. (*Id.* at 411).

AMC negotiated, but no resolution was reached.

In January 1999, the Government filed this action.

### III. Motion to Strike

■ The Government moves to strike portions of the declaration of AMC's counsel of record in this action, Gregory F. Hurley, on the basis that the declaration does not conform with the requirements of Fed.R.Civ.P. 56(e). Rule 56(e)provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed.R.Civ.P. 56(e).

At issue are five paragraphs of the declaration, all of which are relevant to AMC's estoppel-type arguments, which are detailed more fully below. Specifically, the Government moves to strike 1) paragraph 4, in which AMC's counsel states that AMC placed wheelchair spaces in the front of all its auditoriums as a result of the *Fiedler v. AMC* litigation, in which the Government filed an amicus brief; 2) paragraph 7, in which AMC's counsel states that AMC modified its plans for all future theaters by placing wheelchair seats in the fourth row in its theaters in response to a consent decree (to which the Government was a party) issued in *Arnold v. United Artists*; 3) paragraph 9, in which AMC's counsel states that the Government advised AMC in December 1998 that it would file suit unless AMC agreed that § 4.33.3 required wheelchair spaces to provide viewing angles that were at the median or better than the viewing angles provided to customers seated in the stadium portion of the auditorium; 4) paragraph 15, in which

AMC's counsel states that AMC, in response to the Government's amicus brief in the *Lara* action, changed its design criteria to require that wheelchair spaces be placed in the stadium-seating area and that they provide specific viewing angles to the top of the screen; and 5) paragraph 16, in which AMC's counsel states that of the 83 theater complexes at issue in this suit, nearly 75% were designed before the *Lara* brief.[17]

Paragraphs 4, 7, 15, and 16 are **hereby stricken** for the reasons set forth *supra.* Paragraph 9 is conclusory and inconsistent with the factual record, which reveals that the Government began communicating with AMC in June 1998 regarding the possibility of filing the present action; for that reason, paragraph 9 is **hereby stricken**. The remainder of the Government's Motion is **hereby denied**.

### IV. Summary Judgment Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. Pro. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it

---

17. The Government also moves to strike paragraph 17, which states that 12 of the 83 theater complexes at issue are located in the Fifth Circuit. However, the Government has admitted that the statement is accurate, and for that reason the Court does not strike it.

is material. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492–93 (9th Cir.1995).

## V. "Lines of Sight Comparable" Under ADAAG § 4.33.3

The Government moves for summary judgment on the issue of whether its interpretation of the meaning of "line of sight" as used in ADAAG § 4.33.3 is reasonable.[18] The Government has not moved for summary judgment regarding the application of § 4.33.3 because that inquiry would raise disputed factual matters regarding "as built" seating configurations in the theaters at issue. A review of the history of this regulation, as well as its text, is therefore in order.

### A. The ADA and § 4.33.3

Congress passed the ADA in 1990, based upon factual findings that the disabled suffered from discrimination, isolation, segregation, and lack of physical access to certain facilities. 42 U.S.C. § 12101(a)(1)-(3), (5). Congress found that the disabled were often politically

powerless and were left without legal recourse to remedy discrimination against them. 42 U.S.C. § 12101(a)(4), (7). Congress also found that discrimination against the disabled left them severely disadvantaged socially, vocationally, economically, and educationally, and denied them the opportunity to achieve independent living and economic self-sufficiency. 42 U.S.C. § 12101(a)(6), (8), (9).

Congress' stated purpose in enacting the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and to "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

Title III of the ADA prohibits discrimination in public accommodations. 42 U.S.C. § 12181—12189. Specifically, the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Movie theaters are considered "public accommodations" under the ADA. 42 U.S.C. § 12181(7)(C) (defining "public accommodation" as including "motion picture houses").

The ADA requires that newly constructed public accommodations (those designed or constructed after January 23, 1993) be "readily accessible to and usable by" individuals with disabilities. 42 U.S.C. § 12183(a)(1). Existing facilities that have been altered after January 26, 1992, must be readily accessible to and usable by indi-

---

**18.** The Government also contends that the Court need not reach this issue if the Court independently interprets § 4.33.3 in a similar manner.

viduals with disabilities "to the maximum extent feasible." 42 U.S.C. § 12183(a)(2).

The Department of Justice, through the Attorney General, is charged with enforcing Title III. The DOJ is also responsible for promulgating regulations implementing Title III, issuing technical assistance materials, and filing suit to enforce compliance with the ADA and the implementing regulations. 42 U.S.C. §§ 12186(b), 12188(b), 12206.

In promulgating regulations, the DOJ is required to adopt regulations that meet the minimum guidelines and requirements issued by the Access Board in accordance with 42 U.S.C. § 12204. After a notice-and-comment period, in July 1991, the DOJ promulgated regulations implementing Title III of the ADA. *See generally* 28 C.F.R., Pt. 36; 56 F.R. 35544 (July 26, 1991).

Those regulations include a requirement that individuals with disabilities be afforded goods, services, facilities, privileges, advantages, and accommodations in the most integrated setting appropriate to the needs of the individual. 28 C.F.R. § 36.203(a). The regulations also provide guidelines on seating in assembly areas, which are separated according to whether a structure is an "existing facility" or "new construction":

a) Existing facilities.

(1) To the extent that it is readily achievable, a public accommodation in assembly areas shall—

(i) Provide a reasonable number of wheelchair seating spaces and seats with removable aisle-side arm rests; and

(ii) Locate the wheelchair seating spaces so that they—

(A) Are dispersed throughout the seating area;

(B) Provide lines of sight and choice of admission prices comparable to those for members of the general public;

(C) Adjoin an accessible route that also serves as a means of egress in case of emergency; and

(D) Permit individuals who use wheelchairs to sit with family members or other companions.

(2) If removal of seats is not readily achievable, a public accommodation shall provide, to the extent that it is readily achievable to do so, a portable chair or other means to permit a family member or other companion to sit with an individual who uses a wheelchair.

(3) The requirements of paragraph (a) of this section shall not be interpreted to exceed the standards for alterations in subpart D of this part.

(b) New construction and alterations. The provision and location of wheelchair seating spaces in newly constructed or altered assembly areas shall be governed by the standards for new construction and alterations in subpart D of this part.

28 C.F.R. § 36.308. For "new constructions", the guidelines are referred to in 28 C.F.R. § 36.406: "(a) New construction and alterations subject to this part shall comply with the standards for accessible design published as appendix A to this part (ADAAG)." Appendix A refers to the "ADA Accessibility Guidelines," or "ADAAG."

Section 4.33.3 of the ADAAG addresses placement of wheelchair locations:

Wheelchair areas shall be an integral part of any fixed seating plan and shall be *provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public . . . .* When the seating capacity

exceeds 300, wheelchair spaces shall be provided in more than one location.

*Id.* (emphasis in the original).

## B. AMC Must Provide Wheelchair–Bound Customers Seating with Viewing Angles Comparable to Those Provided to Members of the General Public

■ At the outset, the Court notes that it does not find the Fifth Circuit's opinion in *Lara v. Cinemark, U.S.A.,* 207 F.3d 783 (5th Cir.2000), *cert. denied,* 531 U.S. 944, 121 S.Ct. 341, 148 L.Ed.2d 274 (2000), to be persuasive. The Fifth Circuit determined that § 4.33.3's reference to "line of sight comparable" meant simply "unobstructed view." In the reasoning of the Fifth Circuit, so long as the wheelchair-bound customer could see over the head and shoulders of the person sitting in front of him or her, then § 4.33.3 was satisfied. The Fifth Circuit relied on other references in the Code of Federal Regulations to "lines of sight" and concluded that in each instance the reference concerned the presence or absence of obstructions. The Fifth Circuit also relied on the fact that the Access Board had recently proposed modifying § 4.33.3 to explicitly require that wheelchair users be provided with unobstructed lines of sight.

None of the federal regulations cited by the Fifth Circuit have any applicability here. Those references involve placement of antennae, what constitutes "direct supervision", and operation of snowmobiles by juveniles under the age of 16. *See* 47 C.F.R. § 73.685; 46 C.F.R. § 13.103; and 36 C.F.R. § 2.18.

The Fifth Circuit also cited the following portion of the Access Board's Notice of Proposed Rulemaking:

> The Board is aware of the Department of Justice's enforcement of 4.33.3 with respect to assembly areas with stadium-style seating. DOJ has stated that 4.33.3 requires that wheelchair areas be an integral part of any fixed seating plan, and be provided so that people with disabilities have lines of sight and a choice of admission prices comparable to those for other members of the general public. As applied to stadium-style theaters (where most seats are placed on tiers or risers to enhance viewing), DOJ has asserted in attempting to settle particular cases that wheelchair seating locations must: (1) Be placed within the stadium-style section of the theater, rather than on a sloped floor or other area within the auditorium where tiers or risers have not been used to improve viewing angles; (2) provide viewing angles that are equivalent to or better than the viewing angles (including vertical, horizontal, and angle to the top of screen) provided by 50 percent of the seats in the auditorium, counting all seats of any type sold in that auditorium; and (3) provide a view of the screen, in terms of lack of obstruction (e.g., a clear view over the heads of other patrons), that is in the top 50 percent of all seats of any type sold in the auditorium. The Board is considering whether to include specific requirements in the final rule that are consistent with DOJ's interpretation of 4.33.3 to stadium-style movie theaters.

64 F.R. 62248, 62277–78. After quoting this provision, the Fifth Circuit then concluded that it is "significant" that the proposed regulations define "line of sight" problems in the context of obstructed views, and that the Board recognizes that additional language is necessary to codify the DOJ's litigating position.

In the Court's view, however, the Fifth Circuit fails to recognize the importance of the language in the Notice of Proposed Rulemaking that immediately precedes the portion quoted above. This language suggests that "line of sight" refers not only to

possible obstructions, but also refers to viewing angles:

Stadium-style motion picture theaters comprise a type of assembly area that has become increasingly popular in the last several years. They provide the general public with sight lines to the screen that generally are far superior to those offered in traditional-style motion picture theaters. Stadium-style theaters provide improved viewing in one key way: they furnish an unobstructed view of the entire screen through the utilization of relatively high risers that furnish unobstructed viewing over the heads of the persons seated in the rows ahead. As stadium-style theaters are currently designed, patrons using wheelchair spaces are often relegated to a few rows of each auditorium, in the traditional sloped floor area near the screen. *Due to the size and proximity of the screen, as well as other factors related to stadium-style design, patrons using wheelchair spaces are required to tilt their heads back at uncomfortable angles and to constantly move their heads from side to side to view the screen. They are afforded inferior lines of sight to the screen.*

*Id.* at 62277 (emphasis added). In this language, the Board uses "inferior lines of sight" to refer to uncomfortable viewing angles, not just to obstructions.

AMC also relies on *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 142 F.Supp.2d 1293 (D.Or.2001). The court in *Regal Cinemas* also concluded that "lines of sight comparable" referred only to possible obstructions. However, in doing so, that court relied on *Lara* and is therefore unpersuasive. For the same reason, the Court also finds unpersuasive *United States v. Cinemark, USA, Inc.*, No. 1:99 CV–705, 2001 U.S. Dist. LEXIS 24418 (N.D.Ohio 2001).

The Court agrees with the *Lara* Court that there is no evidence that the Access Board considered the issue of stadium-style theaters when § 4.33.3 was adopted. Indeed, the record is clear that the first such theater complex was not built until well after its passage. However, absent a requirement that the promulgated regulations cannot be flexibly interpreted to apply to innovative forms of construction, the Court will not interpret § 4.33.3 to be static and inflexible. The language of § 4.33.3 at issue, "lines of sight comparable", itself implies that the standard is a flexible one. Based on the record in this action, it is clear to the Court that AMC understood— or should have understood—that the meaning of "lines of sight" in the context of motion picture theaters referred not only to possible obstructions but also to viewing angles. With that understanding came the obligation under the ADA to attempt to provide wheelchair-bound customers with comparable viewing angles to those provided to members of the general public.

Although the Court can certainly understand the potential for AMC and other theater owners to become frustrated with the lack of specific technical direction provided by § 4.33.3, the Court is not moved by AMC's argument that, when it located its wheelchair seating primarily in the front four rows of its stadium-style theaters, it met ADA requirements. In a closer case, perhaps the Court would give this argument more weight. Mathematical precision of comparability in the design of wheelchair seating placement is certainly not required. Here, however, AMC has marketed its stadium-style theaters as "virtually suspend[ing] the moviegoer in front of the wall-to-wall screen." It has represented that "all seats" are the "best in the house." AMC has acknowledged a clear customer preference for stadium-style seating. As early as November 1996,

an AMC official noted that the placement of wheelchair seating on the sloped-floor was "insulting to the disabled." Another official acknowledged that the placement of wheelchair seating was an afterthought. Another discussed the concept of a "comfort zone" in a theater and admitted that the sloped-floor portion of the theater was outside that zone. The view from the seats on the sloped-floor portion of the theater was, in his assessment, "god awful." AMC has also acknowledged that it, on at least two occasions, simply added extra rows in the front of the theater (in violation of its own design criteria) so that the wheelchair seating appeared to be further back from the screen.

The Court's interpretation is consistent with the court's observation in *Meineker v. Hoyts Cinemas Corp.*, 216 F.Supp.2d 14 (N.D.N.Y.2002):

> The Guideline requirement that lines of sight be "comparable" requires more than that lines of sight for wheelchair patrons be simply unobstructed. The requirement that a line of sight be "comparable" clearly imposes a qualitative requirement that the sight line be "similar" and not merely "similarly unobstructed." As such, it is held that it would not be sufficient for defendant to merely provide lines of sight to the screen that are unobstructed.... This requirement is necessary to address the potential situation where a defendant has relegated wheelchair patrons to a portion of the theater that provided tru-

ly inferior viewing angles and limited or no seating for the general public—such as was the case at the start of this litigation where wheelchair patrons were relegated to the absolute worst seats at the very front of the theaters. It would defy common sense to describe the lines of sight afforded by such viewing positions as "comparable" merely because they were unobstructed. Had Hoyts not undertaken the renovations to relocate the wheelchair seating at the Crossgates theaters, it would unquestionably have been in violation of the ADA.

*Id.* at 18.

This Court's holding is also consistent with the court's observation in *Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698, 712 (D.Or.1997), that an arena owner may not create a "wheelchair ghetto" that consigns wheelchair users to the least desirable seats in the house.

■ For these reasons, the Court concludes that those AMC designs of stadium-style theaters that place wheelchair seating solely on the sloped-floor portion of the theater fail to provide "lines of sight comparable to those for members of the general public"; therefore, these designs violates § 4.33.3.[19] Summary judgment on this issue is hereby granted in favor of the Government.

---

**19.** At oral argument, AMC's counsel asked that the Court provide as much guidance as possible on this issue to AMC, which must design and build its theaters "in three dimensions" and must do so in compliance with the ADA, especially § 4.33.3. The Court does not today promulgate any hard-and-fast rules. Given that § 4.33.3 mandates that wheelchair-bound patrons be provided with comparable lines of sight, per se rules are simply not possible because the requirements of comparability (and therefore of § 4.33.3) will vary

based on theater layout. Rather, the Court holds that the wheelchair seating must be placed in the theater so that the wheelchair customer's moviegoing experience approximates that of the ambulatory customer. The Court agrees with the Government's position that § 4.33.3 does not require that wheelchair-bound customers be afforded the best seats in the house, but that § 4.33.3 does not permit wheelchair-bound customers to be relegated to the worst seats in the house.

## C. Deference to the Government's Position

Even if the Court were to interpret § 4.33.3 differently, it would be compelled in this instance to give deference to the Government's position on this issue. Courts must give deference to agency interpretations unless those positions are "plainly erroneous or inconsistent with" the regulation. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

AMC argues that the Government's position is not worthy of deference because § 4.33.3 is not the DOJ's regulation. This argument draws its roots from the fact that the Access Board, rather than the DOJ, drafted § 4.33.3. However, the Court rejects this arguments for the reasons set forth in *Paralyzed Veterans of America v. D.C. Arena, L.P.*, 117 F.3d 579, 585–86 (D.C.Cir.1997), *cert. denied sub nom.*, 523 U.S. 1003, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998).

■ AMC also argues that the Government's position is not worthy of deference because it does not represent a "fair and considered judgment on the matter in question." *See Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (noting that an agency's position is not unworthy of deference merely because comes to the court in the form of a legal brief). "Fair and considered judgments" should be contrasted with "post hoc rationalization advanced by an agency seeking to defend past agency action against attack." *Id.* The Supreme Court noted this contrast by citing *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), a case upon which AMC relies. *Bowen* makes clear that determining whether a position is a "fair and considered judgment" requires inquiry into whether that position is inconsistent with the regulation itself, and whether the position taken is inconsistent with previous positions taken by the agency. *See id.* at 456–47, 117 S.Ct. 905. In *Bowen*, the Supreme Court rejected the agency's position because it was inconsistent with the regulation, and because it was inconsistent with the agency's previous position. *Id.* ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

Here, the Court has already concluded that the Government's position is consistent with the regulation. The Court also concludes that the agency's position represents its "fair and considered judgment" rather than its "post hoc rationalization." The position taken by the Government in connection with this litigation is consistent with the position it took in the 1998 *Lara* amicus brief, and, more recently, in the *United States v. Cinemark USA, Inc.*, action.

Therefore, the Court concludes that the Government's position on § 4.33.3, as articulated in the *Lara* amicus brief and as understood by this Court, represents the fair and considered judgment of the DOJ, and is a reasonable interpretation. Accordingly, the Government's position is entitled to deference, and summary judgment in favor of the Government is **hereby granted** as to this issue.

## VI. Additional Issues Raised by AMC's Motion for Summary Judgment

In its own Motion for Summary Judgment, AMC raises two additional issues that are not addressed by the Government's Motion. First, AMC argues that the Court should not retroactively apply the Governments position because to do so would violate due process. Second, AMC argues that the Court should grant summary judgment in its favor as to all claims to the extent those claims apply to the-

aters that are located in the Fifth Circuit, where the *Lara* decision controls.

## A. Retroactive Application

■ Due process requires that enactments not be so vague as to not give fair warning of what is prohibited. *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). This requirement serves the purpose of giving a person of ordinary intelligence a reasonable opportunity to know what is prohibited (so that he or she may act accordingly). *Id.* Another purpose is to avoid arbitrary and discriminatory enforcement of the law. *Id.*

AMC argues that the "lines of sight comparable" provision of § 4.33.3, prior to the Government's amicus brief in *Lara*, was too vague to provide them with such fair warning. AMC cites three cases in support of its position: *Georgia Pacific Corp. v. Occupational Safety and Health Review Commission*, 25 F.3d 999 (11th Cir.1994); *Chalmers v. City of Los Angeles*, 762 F.2d 753 (9th Cir.1985); and *Crown Pacific v. Occupational Safety & Health Review Commission*, 197 F.3d 1036 (9th Cir.1999).

In *Georgia Pacific*, the Court held that a phrase in OSHA regulations regarding when forklifts may carry loads in a forward position and when they must "trail" those loads was unconstitutionally vague. In doing so, the Court relied on the fact that the agency was unable to settle on a single definition of the phrase "obstructs forward view", espoused no fewer than three different definitions of this phrase at oral argument, and conceded that the phrase was ambiguous.

In *Chalmers*, the Court held that where a street vendor was faced with conflicting ordinances, and where the vendor received reassurances and advice from city employees that she could sell T-shirts from a pushcart, the vendor's due process rights were violated when she was harassed by police and threatened with arrest for selling T-shirts from her pushcart.

In *Crown Pacific*, the Court held that the agency's interpretation failed to give fair warning because the interpretation was not reasonable in that it stretched the plain language of the regulation beyond its plain and natural meaning.

■ These three cases are all distinguishable here. Despite AMC's repeated protestations to the contrary, the Government has not advocated conflicting interpretations of § 4.33.3. Moreover, as this Court has already held, the Government's interpretation of § 4.33.3 is reasonable. It is clear to the Court that AMC should have understood § 4.33.3 to require comparable viewing angles for its wheelchair-bound customers in its stadium-style theaters.

Accordingly, the Court discerns no violations of due process would occur as the result of retroactive application of the Government's position.

## B. Theaters in Fifth Circuit

■ AMC argues that the Court should grant summary judgment in its favor as to all claims to the extent those claims apply to theaters that are located in the Fifth Circuit, where the *Lara* decision controls. However, "[t]he courts do not require an agency of the United States to accept an adverse determination of the agency's statutory construction by any of the Circuit Courts of Appears as binding on the agency for all similar cases throughout the United States." *Railway Labor Executives' Ass'n v. Interstate Commerce Commission*, 784 F.2d 959, 966 (9th Cir.1986). The Ninth Circuit has recognized that "[i]t is standard practice for an agency to litigate the same issue in more than one circuit and to seek to enforce the agency's interpretation selectively on the persons

subject to the agency's jurisdiction in those circuits where its interpretation has not been judicially repudiated." *Id.* It is clear to the Court that so long as this Court has personal jurisdiction over AMC (and AMC has given the Court no reason to conclude otherwise), then this action may address the wheelchair seating placement in AMC's theaters nationwide.

AMC's concerns that it would be subjected to conflicting legal obligations with respect to its Fifth Circuit theaters are simply unfounded. The *Lara* decision imposed no legal obligation on AMC. Indeed, AMC's theaters were not even at issue in the *Lara* case. Therefore, AMC would not be faced with a choice between complying with this Court's orders and the *Lara* court's orders.

The Court **hereby denies** AMC's Motion for Summary Judgment.

## VII. Motion for Summary Judgment as to AMC's Affirmative Defenses

The Government moves for summary judgment as to AMC's affirmative defenses. The Government groups these affirmative defenses into three categories:[20] 1) First, the Government identifies the Administrative Procedure Act ("APA") related affirmative defenses (2, 18–22). The Government argues that these affirmative defenses are barred by the law of the case doctrine and/or collateral estoppel. 2) The Government groups together the affirmative defenses based on equitable estoppel, judicial waiver, laches, jurisdictional, failure to mitigate, and unclean hands (3–7, 10, 13, 17, 23–25). The Government argues that these affirmative defenses lack

factual support. 3) The Government also groups together the affirmative defenses based on statutes of limitations, collateral estoppel, res judicata, third-party negligence, and third-party privilege. The Government argues that these affirmative defenses are not legally viable and fail for that reason.

### A. APA–Related Defenses

On December 17, 1999, the Court entered an order that granted the Government's Motion to dismiss a counterclaim asserted by AMC. (*See* Court's December 17, 1999, Order). The counterclaim alleged that, "under the guise of interpreting the ADA, [the] DOJ 'has impermissibly and without notice' adopted a new rule of law in violation of the [APA], 5 U.S.C. §§ 552, 553." *Id.* at 2. This ruling effectively precluded AMC from asserting its second affirmative defense, which reads: "Plaintiff's claims are barred because Plaintiff failed to comply with the Administrative Procedure Act, 5 U.S.C. § 552 *et seq.* ('APA') in promulgating the interpretation of the regulations Plaintiff now asserts in this action."

Plaintiff argues that a report and recommendation of the magistrate judge in the *Cinemark* action in Texas concluded that the DOJ's interpretation of § 4.33.3 constituted "final agency action" and therefore violated the APA. This argument was rejected in the Court's June 23, 2000, Order granting the Government's motion to dismiss the counterclaim of former Defendant STK Architecture, Inc. (*See* Court's June 23, 2000, Order). So too was an argument made by AMC based on the Access

---

**20.** The Government does not move for summary judgment as to the following affirmative defenses asserted by AMC: 1, 14–16. The first affirmative defense states that the complaint fails to state a claim upon which relief can be granted. This is not an affirmative defense. The fourteenth and fifteenth affirmative defenses related to AMC's contention that the relief sought, if granted, would fundamentally alter the nature of the facilities AMC operates, and is not readily achievable or technically feasible. The sixteenth affirmative defense relates to "dimensional tolerances" of barriers protruding from walls.

Board's November 1999 notice of proposed rulemaking. (*Id.*)

Summary Judgment in favor of the Government is hereby granted as to AMC's second affirmative defense.

AMC disagrees that its affirmative defenses 18–22 should be classified as APA-related defenses. Instead, AMC contends that these defenses are based on its due process rights, and refers the Court to its arguments as set forth in its Motion for Summary Judgment. (*See* AMC Opposition at 2, n. 1). Accordingly, for the reasons set forth above in connection with the Courts' denial of AMC's Motion for Summary Judgment, the Court hereby grants summary judgment in favor of the Government as to AMC's eighteenth through twenty-second affirmative defenses.

## B. Equitable Defenses

AMC argues generally that certain actions by the Government leave open the possibility that these equitable defenses (3–7, 10, 13, 17, 23–25) could prevail. Specifically, AMC points to the *Lara* amicus brief, the "Department's 'Wheelchair Seating in Motion Picture Theaters: New Construction Requirement' guidelines,"[21] Russo's statements in March 1997, the Government's amicus brief in the *Fiedler* case, and a DOJ's attorney's participation in providing proposed revisions to techni-cal assistance manuals that related to lines of sight over standing spectators. None of these actions help AMC.

AMC asks that the Government be limited to its interpretation of § 4.33.3 as articulated in the *Lara* amicus brief. The Court does not find this argument persuasive. The Government has stated elsewhere in the record regarding this issue that "[i]t is Standard 4.33.3, however, and not the Department of Justice's interpretation, that has legal effect." The Government also agreed with Judge Morrow that interpretation of § 4.33.3 was "a legal issue." Legal issues are left to the Court to resolve. In any event, the Court has already found that the Government's position in this action is consistent with its position in the *Lara* amicus brief.

Russo's statements do not support AMC's position, either. Russo specifically stated that his comments should not be construed as the DOJ's position on the issue of wheelchair seating placement. AMC's selective quotation of the transcript of the meeting at which Russo spoke does not change this fact.

The issue of lines of sight over standing spectators is not implicated in this action[22] and therefore the Government's actions regarding this issue is irrelevant. For that reason, the Government's actions as de-

---

**21.** AMC's relies on a document to which it refers as "[t]he Department's 'Wheelchair Seating in Motion Picture Theaters: New Construction Requirement' guidelines". (*See* Opposition at 17). This is yet another example of a deliberate misrepresentation by AMC's counsel to this Court. AMC's counsel has represented that this document was "interpretations and public information disseminated by [the Government]." However, the record reveals that this document is not a Government document, **and that AMC counsel has been aware of this fact since at least April of this year.** Instead, this document, which does not identify its author, is a proposal made by a private advocacy group, and was given to the Government (and presumably produced to AMC in discovery). The document does not represent the position of the Department, and is therefore irrelevant to AMC's equitable defenses.

**22.** The issue over line of sight over standing spectators has been litigated in at least three cases. *See Lara,* 207 F.3d at 788 (citing cases). This issue has arisen mostly in sports-stadium design, where spectators can be expected to stand through at least part of the time. This issue is not implicated in this action, where there is no evidence that AMC customers routinely stand during movie screenings.

scribed in a case cited by AMC that involved lines of sight over standing spectators, *Paralyzed Veterans of America v. D.C. Arena*, 117 F.3d 579 (D.C.Cir.1997), in which the court criticized the Government for not providing expertise, is unpersuasive. So too is the case of *Oregon Paralyzed Veterans of America v. Regal Cinemas*, 142 F.Supp.2d 1293 (D.Or.2001). The Government was not a party or amicus in that case.

AMC argues that its failure to mitigate defense applies to the individual claimants, not the Government. Therefore, AMC argues, summary judgment should not be granted as to this defense. AMC presents no evidence regarding the individual claimants' failure to mitigate. The moving party's burden on summary judgment is not an evidentiary burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Rather, it is sufficient that the moving party point to an absence of evidence as to an issue upon which the nonmoving party bears the burden at trial. *Id.* Here, AMC has not met that evidentiary burden because it has presented no evidence that the individual claimants failed to mitigate their damages.

AMC also contends that in November 1994, the Government published a Supplement to its Technical Assistance Manual that provides that stadium-style seating assembly areas could comply with ADAAG § 4.33.3's line of sight requirements by placing wheelchair locations in the front of seating sections. However, as the Government points out, this Supplement, published before the opening of AMC's first stadium-style theater, clearly addressed wheelchair seating at sports stadiums, where the audience could be expected to stand at times throughout the event.

The Court **hereby grants** summary judgment in favor of the Government as to AMC's equitable affirmative defenses (3–7, 10, 13, 17, 23–25).

### C. Statutes of Limitations, Collateral Estoppel, Res Judicata, Third–Party Negligence, and Third-party Privilege

#### 1. Statute of Limitations

██ The United States is not subject to any state statute of limitations and is subject to a limitations period only when Congress expressly creates one by federal statute. *See United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *United States v. Thornburg*, 82 F.3d 886, 893 (9th Cir.1996). There is no federal statute that imposes a limitations period for an enforcement action by the Government under the ADA. In any event, assuming that there was an applicable statute of limitations, the action by AMC alleged to constitute a violation of the ADA is ongoing, so as to toll the statute of limitations. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, ———–———, 122 S.Ct. 2061, 2073–76, 153 L.Ed.2d 106 (2002).

#### 2. Collateral Estoppel and Res Judicata

██ In order for the Government to be collaterally estopped from relitigating issues of fact or law that were previously litigated, AMC must offer evidence to show that there was a mutuality of parties in the previous litigation. *See United States v. Mendoza*, 464 U.S. 154, 159–63, 104 S.Ct. 568, 572–74, 78 L.Ed.2d 379 (1984) (holding that nonmutual offensive collateral estoppel does not apply against the federal government); *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1578–79 (11th Cir.1985) (applying *Mendoza* and holding that nonmutual defensive collateral estoppel cannot be applied to the state government). AMC has not shown the required mutuality.

■ Res judicata bars a later action when a previous action 1) involved the same parties or their privies, 2) the prior litigation was terminated by a final judgment on the merits, and 3) the prior litigation involved the same claim or cause of action as the later suit. *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 888 (9th Cir.2000). AMC points to three previous cases. The *Fiedler* and *Regal Cinemas* cases do not bar the claims presented in this action because the Government merely filed amicus briefs in these actions and were not formal parties. The United States was a party in the *United States v. Cinemark* case; however, AMC was merely an intervener in that action. AMC intervened for the limited purpose of challenging § 4.33.3 by arguing that the Government violated the APA in adopting its position on § 4.33.3—a position that the *Cinemark* court and this Court have explicitly rejected. Therefore, the *Cinemark* case did not involve the same claim or cause of action against AMC that is at issue in this action.[23]

■ AMC's eleventh affirmative defense states that if its actions have violated the ADA, these violations were caused by the negligence and/or fault of others. However, the ADA is clear that a public accommodation is responsible for its own violations of the ADA, and that such violations cannot be contracted away. *See* 42 U.S.C. § 12182(b)(1)(A)(i) (a public accommodation may not discriminate against "an individual or class of individuals on the basis of a disability ... directly, or through contractual, licensing, or other arrangements"). AMC points to no authority that suggests that liability under the ADA can be reduced in light of the violator's reliance on another individual or entity.

■ AMC's twelfth affirmative defense states that its conduct was privileged in that it was undertaken pursuant to the terms of the applicable laws, regulations, orders and approvals relating to building construction and/or public health and safety. Any local laws that permit the building or alteration of structures that afford less protection to the disabled are preempted by the ADA. *See* 42 U.S.C. § 12201(b) (providing exemption from preemption for only those state or local laws that provide greater protection to the disabled).

AMC argues that it was "compelled" to raise certain affirmative defenses or risk waiver of these defenses. AMC further argues that certain defenses will be supported by the facts of the case, depending upon the injunctive relief sought by the Government. AMC contends that the Government is not prejudiced by the maintenance of these affirmative defenses because AMC bears the burden of proof on these defenses at trial, and asks that the Court deny summary judgment on that basis. AMC misunderstands the function of the summary judgment motion. Although the burden on a party moving for summary judgment is substantial, the burden in *opposing* a motion for summary judgment is not to be underestimated. At least three circuits have described the summary judgment stage as the "put up or shut up" moment in a lawsuit, when the nonmoving party must show what evidence it has that would convince a trier of fact to accept its version of events. *See, e.g., Weinstock v. Columbia University*, 224 F.3d 33 (2d Cir.2000); *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Cox v. Kentucky Dep't of Transportation*, 53 F.3d 146 (6th Cir.1995). As its

---

**23.** This previous decision does bar relitigation of AMC's APA-related defenses, which AMC nonetheless raised in this litigation.

own arguments demonstrate, AMC has failed to carry its burden, and may not be excused from this burden merely because of a purported lack of prejudice to the Government.

## VIII. Conclusion

The Court **hereby grants in part** the Government's Motion to Strike the September 26, 2002, Declaration of Gregory G. Hurley (docket # 371).

The Court **hereby grants** the Government's Motion for Summary Judgment on the "Line–of–Sight" Issues (docket # 366), and **hereby denies** AMC's Motion for Summary Judgment on the same issue (docket # 246).

The Court **hereby grants** the Government's Motion for Summary Judgment regarding Defendants' Affirmative Defenses (docket # 379).