# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

AMC ENTERTAINMENT, INC.;
AMERICAN MULTI-CINEMA, INC.,
           *Defendants-Appellants.*

No. 06-55390

D.C. No.
CV-99-01034-FMC

OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
November 7, 2007—Pasadena, California

Filed December 5, 2008

Before: Kim McLane Wardlaw, Carlos T. Bea, and
N. Randy Smith, Circuit Judges.

WARDLAW, K., delivered the opinion of the Court as to
Parts I, II.A, II.B, and III, in which BEA, C., and SMITH,
N. R., joined. SMITH, N. R., delivered the opinion of the
Court as to Part II.C, in which BEA, C., joined. WARDLAW,
K., filed a dissenting opinion as to Part II.C.

15935

**COUNSEL**

Laura M. Franze (argued), M. Brett Burns, Edward P. Lazarus, and Michael C. Small, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California, and Dallas, Texas, for the defendants-appellants.

Gregory B. Friel (argued), Wan J. Kim, and Jessica Dunsay Silver, Department of Justice, Washington, D.C., for the plaintiff-appellee.

---

**OPINION**

WARDLAW, Circuit Judge:

In this action the United States Department of Justice seeks to enforce Title III of the Americans with Disabilities Act ("ADA"), 48 U.S.C. §§ 12181-89, so as to require AMC Entertainment, Inc. and American Multi-Cinema, Inc. (collectively, "AMC") to provide "full and equal enjoyment" to disabled moviegoers in ninety-six stadium-style multiplexes located across the nation. Liability is settled, as our circuit has definitively determined that the pertinent guideline drafted by the Architectural and Transportation Barriers Board (the "Access Board") and adopted by the Attorney General as part of the "Standards for Accessible Design," 28 C.F.R. pt. 36, app. A, § 4.33.3 ("§ 4.33.3"), requires that theaters provide "a viewing angle for wheelchair seating within the range of angles offered to the general public in the stadium-style seats." *Or. Paralyzed Veterans of Am. v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1133 (9th Cir. 2003), *cert. denied*, 542 U.S. 937 (2004). Correctly anticipating our holding in *Oregon Paralyzed Veterans*, the district court held that AMC's existing facilities violate § 4.33.3's light of sight requirement, awarded summary judgment to the government, and subsequently issued a comprehensive remedial order. *United States v. AMC*

*Entm't, Inc.*, 232 F. Supp. 2d 1092 (C.D. Cal. 2002). The "Order Re: Line of Sight Remedies" sets forth a series of detailed injunctive orders specifying compliance with § 4.33.3 for the ninety-six affected AMC multiplexes containing 1,993 auditoria throughout the nation. AMC timely appeals.

Because the injunction requires modifications to multiplexes that were designed or built before the government gave fair notice of its interpretation of § 4.33.3, the injunction violates due process—and to that extent, its issuance was an abuse of discretion. A two-judge majority of this panel also holds that the district court abused its discretion in neglecting comity concerns pertaining to the Fifth Circuit's existing, less stringent interpretation of § 4.33.3, while the dissenting judge would affirm the scope of the nationwide injunction. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand for further proceedings.

## I.   BACKGROUND

### A.   *Stadium Seating*

In the mid-1990s, stadium seating in movie theaters revolutionized the way Americans viewed movies. Rather than cramming seats together on a sloped floor, causing moviegoers to be at the mercy of a taller patron choosing the seat in front of them, the staggered elevation of stadium seating "virtually suspend[ed] the moviegoer in front of the wall-to-wall screen." Along with the other major theater companies, AMC constructed scores of theaters nationwide employing the new layout. Promoting its theaters, AMC invited the public to "Experience the Difference." The Department of Justice claimed that one group could not: the disabled.

The first iteration of stadium-seating theaters, initially constructed by AMC in 1995, posed a particular problem for wheelchair-bound patrons. These complexes offered a hybrid of traditional sloped floor seating closest to the screen and sta-

dium seating accessible by stairs. Moviegoers would enter the theater in the front, right under the screen. Once entering, patrons would first have the option (rarely, if ever, taken) of sitting in the few rows of traditional sloped-floor seating closest to the screen. Or if they preferred (and were able), they could bypass these first rows and climb stairs to choose a seat within the stadium-seating section of the theater. The impossibility of the latter option relegated disabled patrons to the least desirable seats in the rows closest to the screen.

Complaints from wheelchair-bound customers began immediately. The mother of a disabled viewer complained to AMC that their seats in the second row "made it impossible to see this movie at such a close range." A disabled Missourian explained in more detail his experience while sitting in the limited wheelchair seating offered by AMC:

> [My] eagerness quickly turned to anger and then despair as I found myself in a brand new theater where, from a viewing and comfort standpoint, I was worse off than ever before. While your theater seats appear very comfortable and positioned to maximize the theater goer's [sic] view of the screen, my wheelchair has a rigid frame and straight back. From my vantage point on the far right side of the second row from the screen I was forced to endure two hours of neck wrenching discomfort as I struggled to find a comfortable way to view the entire screen. . . . If not the least desirable location in the theater, the wheelchair area must be a close second.

AMC apparently responded to customer complaints and began to modify its design for future theaters. Later iterations of the multiplex permitted entry in the mid-section of the auditorium, allowing for wheelchair seating in the center of the cinema. By 2001, AMC offered full stadium seating for all patrons in its newly constructed theaters. Nevertheless, the initial spurt of theater construction specked communities with

theaters restricting wheelchair seating to the very front of the auditorium.

## B.    The ADA and § 4.33.3

In response, the DOJ, along with numerous private plaintiffs, brought a series of nationwide suits against various theater companies alleging that the theaters violated Title III of the ADA, 42 U.S.C. § 12182, by placing wheelchair seating in the front rows of their new stadium complexes.

Title III of the ADA generally provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a). To flesh out the details of this general rule, Congress charged the Attorney General with the task of promulgating regulations clarifying how public accommodations must meet these statutory obligations. 42 U.S.C. § 12186(b). These regulations were to be consistent with the minimum guidelines issued by the Access Board. 42 U.S.C. § 12186(c). Twenty-five individuals comprise the Access Board, thirteen appointed by the president, and twelve representing government departments or agencies. 29 U.S.C. § 792(a)(1). In January 1991, the Access Board proposed accessibility guidelines and provided a notice and comment period to evaluate them. 56 Fed. Reg. 2296 (Jan. 22, 1991). Later that year, the Access Board issued its final ADA Accessibility Guidelines. 56 Fed. Reg. 35,408 (July 26, 1991). The Attorney General adopted these guidelines as the "Standards for Accessible Design." 28 C.F.R. pt. 36, app. A.

Section 4.33.3 of the Standards addresses wheelchair seating in assembly areas. It reads:

> Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to pro-

vide people with physical disabilities a choice of admission prices and *lines of sight comparable to those for members of the general public.* They shall adjoin an accessible route that also serves as a means of egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. Readily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.

EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.

28 C.F.R. pt. 36, app. A, § 4.33.3 (some emphasis removed). Because this regulation pre-dated stadium seating in movie theaters by nearly four years, it did not expressly address whether "lines of sight comparable to those for members of the general public" meant that wheelchair seating must provide a similar viewing angle for disabled patrons. It was not until 1999 that the Access Board publicly noted that the DOJ interpreted this provision to mandate placing wheelchair seating areas in the stadium-seating section that "provide viewing angles that are equivalent to or better than the viewing angles . . . provided by 50 percent of the seats in the auditorium." 64 Fed. Reg. 62,248, 62,278 (Nov. 16, 1999). In 1999, the Access Board concluded that it "is considering whether to include specific requirements in the final rule that are consistent with DOJ's interpretation of 4.33.3 to stadium-style theaters. The Board is also considering whether to provide additional guidance on determining whether lines of sight are 'comparable' in assembly areas . . . ." *Id.* As of this date, the Access Board has failed to do so.

*C.    The Litigation History of § 4.33.3*

While "lines of sight" was a phrase long familiar to parties involved in the movie theater industry, its precise meaning shifted depending upon the particular context and who was using it. Internal correspondence within the industry featured recognition that, at times, "lines of sight" meant viewing angle to the screen. At other times, the movie industry understood "comparable lines of sight" to require only unobstructed views of the screen. Indeed, before the D.C. Circuit, the government insisted that "there was no uniformly understood construction of the language prior to the time it was picked up by the Board and the Department [of Justice]." *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 583 (D.C. Cir. 1997).

Because "lines of sight comparable" lacked a concrete meaning, and the Access Board and the DOJ failed to provide clear direction as to the precise meaning of § 4.33.3, litigants turned to courts throughout the country to determine the regulation's breadth. Plagued by an opaque regulation and minimal legislative history, however, the various circuits did not reach a uniform understanding as to what exactly § 4.33.3 required of theater companies building stadium-seating complexes.

*i.    The Unobstructed View Interpretation*

The first circuits to parse § 4.33.3 did not contemplate the comparable viewing angles interpretation currently adopted by the government. Rather, plaintiffs in the initial round of cases urged the courts to understand the provision as requiring that public accommodations provide disabled spectators only with an unobstructed view to a stage or screen. Unlike the later advocated comparable viewing angles interpretation, the Access Board had anticipated the issue of unobstructed views. The Access Board had requested comment "on whether full lines of sight over standing spectators . . . should be required."

56 Fed. Reg. 2296, 2314 (Jan. 22, 1991). After the comment period, however, the Access Board did not expressly address the issue of unobstructed views in the language of § 4.33.3.

From the opening salvos of litigation, courts admitted their confusion as to what exactly "lines of sight" meant. In *Caruso v. Blockbuster-Sony Music Entm't Ctr. at Waterfront*, 968 F. Supp. 210 (D. N.J. 1997), *rev'd in part*, 193 F.3d 730 (3d Cir. 1999), plaintiffs brought suit against a concert hall for failure to provide wheelchair bound patrons an unobstructed view to the stage. The district court, when asked to assess whether § 4.33.3 required this unobstructed view, expressed its frustration that the regulation, even when read in conjunction with secondary materials, "suffers from a vagueness not cured by interpretive manuals or an enforcement history which would put meat on the bones of the concept of enhanced sight lines." *Id.* at 216. Absent further legislative direction, the district court could not read the language of § 4.33.3 to impose a requirement that disabled viewers enjoy an enhanced line of sight.

Writing for the Third Circuit, then-Judge Alito agreed with the district court's estimation "that the 'lines of sight' language is ambiguous." *Caruso v. Blockbuster-Sony Music Entertainment Centre at Waterfront*, 193 F.3d 730, 733 (3d Cir. 1999). The regulation's ambiguity, in Judge Alito's view, allowed for two conflicting understandings (neither of which the government presently advocates) of what § 4.33.3 mandates: 1) dispersal of seating for disabled viewers throughout the auditorium; or 2) vertically enhanced lines of sight allowing wheelchair-bound patrons to view the stage over standing audience members. After reviewing the notice and comment period for discussion on the unobstructed view theory, the Third Circuit affirmed the district court, concluding that § 4.33.3 "does not reach the issue of sightlines over standing spectators." *Id.* at 736.

This placed the Third Circuit slightly out of line with the D.C. Circuit's opinion in *Paralyzed Veterans of America v.*

*D.C. Arena L.P.*, which had affirmed the district court's reading of § 4.33.3 to require that *some* wheelchair seating provide an unobstructed view over standing spectators at Washington Wizards and Capitals games. 117 F.3d at 580. While the circuits reached different conclusions as to § 4.33.3's exact requirements, the D.C. Circuit and the Third Circuit did agree that the regulation was hardly a model of clarity. *See id.* at 583 (noting that when applied to the issue of standing spectators, the regulation is "ambiguous").

### ii.    The Viewing Angle Interpretation

In 1998, the government filed an amicus brief in the District Court for the Western District of Texas that, for the first time, publicly advocated the litigation position it has taken in this case and others throughout the nation: that § 4.33.3 requires movie theaters to provide wheelchair bound patrons with comparable 'viewing angles' to the screen as non-disabled persons. *Lara v. Cinemark USA, Inc.*, No. EP-97-CA-502-H, 1998 WL 1048497, at *2 (W.D. Tex. August 21, 1998), *rev'd*, 207 F.3d 783 (5th Cir. 2000); *see also United States v. Cinemark USA, Inc.*, 348 F.3d 569, 583 & n.10 (6th Cir. 2003) (accepting government's representation that its *Lara* amicus brief represented the first widely published document expressly announcing that § 4.33.3 required comparable viewing angles). The government explained that the regulatory language, as well as the overarching purpose of the ADA, compelled an understanding of § 4.33.3 that included a comparable viewing angle requirement. This new theory, however, failed to produce a uniform interpretation among the circuit courts of appeal. Ambiguity in § 4.33.3 still hamstrung the various courts in creating a coherent nationwide interpretation of the regulation.

The Fifth Circuit, the first appellate court to consider the viewing angle interpretation, rejected the theory as contrary to the use of similar language in other regulatory contexts. *Lara*, 207 F.3d at 789. Rather, the court concluded that the regula-

tion merely requires that the theater provide an unobstructed view of the screen. The Fifth Circuit did not reach this result without joining the Third and D.C. Circuits in criticizing the lack of transparency in the regulation: "The text of section 4.33.3 provides little guidance as to whether theaters must provide wheelchair-bound moviegoers with comparable viewing angles." *Id.* at 788.

In 2003, our circuit accepted the viewing angle interpretation the Fifth Circuit had rejected, concluding that § 4.33.3 does require comparable viewing angles for disabled patrons. *Oregon Paralyzed Veterans*, 339 F.3d at 1133. We did not reach this result, however, by analyzing the plain meaning of the regulation. Rather, we carefully phrased the issue as one of proper deference to an agency interpretation of its own regulation:

> The question here, then, is whether it is *unreasonable* for DOJ to interpret "comparable lines of sight" to encompass factors in addition to physical obstructions, such as viewing angle. The answer, in light of the plain meaning of the regulation both in general and as understood in the movie theater industry, is "no."

*Id.* at 1132 (emphasis added). Deferring to the DOJ's interpretation, we held that § 4.33.3 required theaters to provide "a viewing angle for wheelchair seating within the range of angles offered to the general public in the stadium-style seats." *Id.* at 1133.

The Sixth Circuit joined our conclusion that § 4.33.3 required comparable viewing angles in *United States v. Cinemark USA, Inc.* 348 F.3d at 575. Reviewing the regulation, the court concluded that the "criteria for evaluating similarity, moreover, while not explicit in the regulation, doubtless include viewing angle." *Id.* at 576. Reading the regulation in any other manner would, in the Sixth Circuit's estimation,

eviscerate the ultimate goal of the statutory scheme: to provide the disabled with equal enjoyment of public accommodations. *Id.* Moreover, as did we, the Sixth Circuit deferred to the DOJ's interpretation of its own regulation. *Id.* at 578.

While technically dicta, the Sixth Circuit did hint at its views regarding an eventual remedy. Cinemark had presented evidence that it had relied upon state building codes previously certified by the federal government when constructing its stadium-seating multiplexes.[1] *Id.* at 581. While the court rejected an estoppel argument on the basis of the permits, it reasoned:

> Cinemark's reliance on TAS and the government's statements with respect to the state building code certification process weigh strongly in favor of making any relief that the district court grants the government on remand apply only on a prospective basis. We do not go so far as to hold that any relief *must* be prospective to comport with due process, but note that, given the following facts, prospective relief will often be most appropriate.

*Id.* With these less than subtle instructions, the Sixth Circuit remanded the case to the district court.

The First Circuit, after noting that "[s]imilar cases have divided the circuits," joined us and the Sixth Circuit in concluding that § 4.33.3 mandates comparable viewing angles. *United States v. Hoyts Cinemas Corp.*, 380 F.3d 558, 561, 566 (1st Cir. 2004). Nevertheless, the court also acknowledged that "[t]here is no doubt that standard 4.33.3 is vague as to whether it embraces angles, that the Justice Department has been slow in providing more precise guidance by regulation,

---

[1]Likewise, AMC presented evidence to the district court that AMC had received state building code certifications for its stadium-seating theaters in both Texas and Florida.

and that the belated amicus brief in *Lara* and the differing conclusions of the courts have impaired predictability." *Id.* at 573. These factors seemed to militate, in the court's view, against retroactive application of this requirement. *Id.* at 573-74.

After the First Circuit's opinion, the tally of the different circuits' opinions as to § 4.33.3 was as follows: in the Third Circuit § 4.33.3 did not even require an unobstructed view; in the D.C. Circuit § 4.33.3 mandated that *some* seats had an unobstructed view; in the Fifth Circuit the provision required an unobstructed view but not comparable viewing angles; and in the First, Sixth and Ninth Circuits § 4.33.3 mandated some sort of comparable viewing angle. Three of the circuits considering the issue credited the DOJ's interpretation, but two of those three expressed skepticism as to the possibility of retroactive relief. All circuits considering § 4.33.3 found common ground on the proposition that the regulation was vague or ambiguous. *See also Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1028-29, 1033 (9th Cir. 2008) (agreeing that " 'lines of light' in § 4.33.3 is subject to several interpretations," detailing the various interpretations, and ultimately concluding that "the DOJ's interpretation of its own regulation is reasonable and therefore entitled to substantial deference").

## D.   The Proceedings Against AMC in the District Court

As the courts grappled with the ambiguous provision, and before we issued our opinion in *Oregon Paralyzed Veterans*, the DOJ brought this action against AMC for violating § 4.33.3 by failing to provide disabled patrons with comparable viewing angles.[2]

---

[2]Because *Oregon Paralyzed Veterans* is the law in our Circuit, AMC does not appeal the merits of the district court's decision below, but only the remedial order.

Granting the DOJ's motion for summary judgment, the district court refused to "interpret § 4.33.3 to be static and inflexible," rejected the Fifth Circuit's interpretation in *Lara*, and concluded that the provision imposed a comparable viewing angle requirement. The court's review of industry literature and AMC correspondence made it "clear to the Court that AMC understood—or should have understood—that the meaning of 'lines of sight' in the context of motion picture theaters referred not only to possible obstructions but also to viewing angles."

To address the infraction, the district court accepted a proposed remedial order crafted by the DOJ detailing how AMC's ninety-six theaters, containing a total of 1,993 stadium-style auditoria, must be retrofitted to comply with § 4.33.3. Over AMC's objection, the district court did not exempt those theaters built before the date when AMC claims it could have reasonably known of the comparable viewing angles requirement. In fact, those first-generation theaters built in 1995 require the most significant retrofitting, including installing ramps, removing mini-risers and constructing new seats, whereas newer theaters, having been altered to respond to customer complaints, require less retrofitting. AMC also argued that any theater located in the Fifth Circuit should be exempted from the remedial order because the Fifth Circuit had held that § 4.33.3 did not require comparable viewing angles. Rejecting this argument, the district court held that its jurisdiction over all AMC theaters allowed it to fashion relief regardless of circuit boundaries.

## II.    DISCUSSION

### A.    Standard of Review

We review the district court's injunction in this matter for an abuse of discretion or an erroneous application of legal principles. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1493 (9th Cir. 1996). A district court has consider-

able discretion in granting injunctive relief and in tailoring its injunctive relief. However, a trial court abuses its discretion by fashioning an injunction which is overly broad. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

B.  *The District Court Abused Its Discretion and Violated AMC's Due Process Rights By Requiring Retrofitting of All Theaters Regardless of Their Date of Construction*

[1] Due process requires that the government provide citizens and other actors with sufficient notice as to what behavior complies with the law. Liberty depends on no less: "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Put more colloquially, "[t]hose regulated by an administrative agency are entitled to know the rules by which the game will be played." *Ala. Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) (internal quotation marks omitted). AMC claims it was not told the rules of building stadium-seating theaters until, at the earliest, the government published its view of § 4.33.3 in its *Lara* amicus brief. We agree.

[2] Examining the conflicting decisions reached by various courts, *see supra* Part I.C, it is clear that the text of § 4.33.3 did not even provide our colleagues, armed with exceptional legal training in parsing statutory language, a "reasonable opportunity to know what is prohibited"—let alone those of "ordinary intelligence." *Grayned*, 408 U.S. at 108. The circuits are split as to whether § 4.33.3 mandates comparable viewing angles, an unobstructed view, or merely dispersed seating options. Indeed, the government itself did not publicly endorse the viewing angle interpretation among these views until it filed a relatively obscure amicus brief in 1998 in the district court for the Western District of Texas. Amid this

morass of litigation, we decline to hold that a person of ordinary intelligence should have known, when initiating a construction project years prior to any public announcement from the relevant agency, that § 4.33.3 was susceptible only to the interpretation the government now champions. Retroactive application of the viewing angle interpretation is appropriate only as of the date on which AMC received constructive notice that the government viewed § 4.33.3 as incorporating a comparable viewing angles requirement and intended to enforce that requirement. *See Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000) ("Although only constructive rather than actual notice is required, individuals must be given a reasonable opportunity to discern whether their conduct is proscribed so they can choose whether or not to comply with the law.").

We share the First Circuit's frustration that the government could have solved this problem, without time- and cost-consuming litigation, by merely clarifying § 4.33.3 through amendment or some other form of public pronouncement: "the regulations were intended to provide guidance and it would have been child's play for the drafters to make clear that the 'lines of sight' requirement encompassed not only unobstructed views . . . but also angles of sight." *Hoyts Cinemas*, 380 F.3d at 566. The government has had ample opportunity throughout the stadium-seating era to update the regulation to respond to the overhaul of the nation's movie-theaters. As late as 1999, the Access Board indicated that it was still "considering whether to include specific requirements in the final rule that are consistent with DOJ's interpretation of 4.33.3 to stadium-style movie theaters." 64 Fed. Reg. 62,248, 62,278 (Nov. 16, 1999). No new rule was forthcoming. Again, in April of 2002, the Access Board published a new proposed draft regulation that included a viewing angle requirement. *See United States v. Hoyts Cinemas Corp.*, 256 F. Supp. 2d 73, 92 (D. Mass. 2003), *vacated*, 380 F.3d 558 (1st Cir. 2004). This proposal was never formally accepted. When Regal Cinemas sought certiorari from the Supreme

Court to resolve the circuit split between the Ninth and Fifth Circuits, the Solicitor General of the United States represented to the Supreme Court that review was not necessary because the DOJ planned to issue new regulations to resolve the split: "There is no need for this Court to exercise its certiorari jurisdiction to address an issue of regulatory interpretation that is presently being addressed directly by the relevant regulatory bodies themselves." Brief for the United States as Amicus Curiae Supporting Respondents, *Regal Cinemas, Inc. v. Stewmon*, 542 U.S. 937 (2004) (No. 03-641), 2004 WL 1205203, at *8. Despite this representation to the Court, made now over four years ago, § 4.33.3 has not been replaced with something more specific.[3] We decline to require AMC to have determined the precise meaning of the regulation when the government did not do so.

The government counters that, regardless of any ambiguity in § 4.33.3, full retroactive application is appropriate presently because it can point to internal correspondence within AMC and throughout the movie industry at large suggesting that theater companies understood "lines of sight" to incorporate a viewing angle requirement.[4] We are skeptical that the meaning of a federal regulation can "rest on the subjective interpretations of discrete, affected persons and their legal advisors." *Florida v. Long*, 487 U.S. 223, 237 (1988). When presented with the same argument from the government, the First Circuit reasoned persuasively: "Nor is it a conclusive answer to argue, as the government does from public sources, that the theater industry has long regarded viewing angles as

---

[3]Compounding the confusion regarding the meaning of § 4.33.3 is that AMC received pre- and post-construction approval for their stadium-seating theaters from multiple states, whose own programs had been certified by the DOJ as "meeting or exceeding" the federal requirements promulgated by the Access Board.

[4]As aforementioned, this argument runs counter to the government's 1997 representation to the D.C. Circuit that "lines of sight comparable" means "unobstructed view." *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 583 (D.C. Cir. 1997).

important in designing theaters and that this was certainly true in 1991 when standard 4.33.3 was framed. Whether or not viewing angles mattered to patrons, the defendants were entitled to provide the minimum that the law required of them." *Hoyts Cinemas*, 380 F.3d at 573. In other words, the capacity of in-house counsel or others to read correctly legislative tea-leaves does not alleviate the government from its obligation to fashion coherent regulations that put citizens of "ordinary intelligence" on notice as to what the law requires of them.

**[3]** "The due process clause . . . guarantees individuals the right to fair notice of whether their conduct is prohibited by law." *Forbes v. Napolitano*, 236 F.3d at 1011. At no point before the 1998 filing of the *Lara* amicus brief was AMC on notice that the regulators understood § 4.33.3 to incorporate a comparable viewing angles requirement. The requirement of fair notice precludes the district court from requiring retrofitting of theaters built before the government announced its interpretation of § 4.33.3. Therefore, we remand this case to the district court to determine the specific date—which can be no earlier than the date on which the government filed the *Lara* amicus brief—on which AMC could have fairly discerned the settled meaning of the § 4.33.3, and to refashion the remedial order accordingly.

\* \* \*

Part II.C:

SMITH, N. R., Circuit Judge with whom BEA, Circuit Judge joins:

*C.   The District Court Abused Its Discretion In Issuing A Nationwide Injunction That Included The Fifth Circuit.*

**[4]** Once a court has obtained personal jurisdiction over a defendant, the court has the power to enforce the terms of the injunction outside the territorial jurisdiction of the court,

including issuing a nationwide injunction. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) (noting that "the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction"); *United States v. Oregon*, 657 F.2d 1009, 1016 n.17 (9th Cir. 1981) ("When a district court has jurisdiction over all parties involved, it may enjoin commission of acts outside of its district."). However, when exercising its equitable powers to issue an injunction, a court must be mindful of any effect its decision might have outside its jurisdiction. Courts ordinarily should not award injunctive relief that would cause substantial interference with another court's sovereignty. *Steele*, 344 U.S. at 289.

The parties do not dispute that AMC owns and operates nearly 100 stadium movie theaters scattered throughout eighteen different states, including 15 theaters in the geographical area of the United States Court of Appeals for the Fifth Circuit. Here, the United States District Court for the Central District Court of California imposed a nationwide injunction affecting movie theaters in the Fifth Circuit (Texas), despite AMC's objection. In *Lara*, the Fifth Circuit reviewed the same authority that the district court reviewed here and the same authority that we reviewed in *Regal Cinemas* and most recently in *Miller v. California Speedway Corp.*, 536 F.3d 1020 (9th Cir. 2008). After such review, the Fifth Circuit interpreted § 4.33.3 to require theaters to provide an unobstructed view for disabled spectators but not to require comparable viewing angles for wheelchair bound patrons.

In *Regal Cinemas*, we specifically rejected the Fifth Circuit holding in *Lara*, and held that the Fifth Circuit's reading of the regulation was too narrow. We then held that theaters in the Ninth Circuit must provide comparable viewing angles for disabled patrons. The district court applied our *Regal Cinemas* precedent issuing the injunction. The injunction essentially requires these Texas theaters to be consistent with the Central District of California's understanding of the require-

ment imposed by § 4.33.3, rather than the Fifth Circuit's reading of the same provision.

Based on this conflict, AMC contends that principles of comity should constrain the district court from enjoining theaters within the Fifth Circuit to provide comparable viewing angles.[5] We agree. We also find that AMC did not waive this argument when it complied with a district court order (which it opposed) and submitted proposed remedial orders for these theaters to assist in formulating the injunction.

[5] This circuit has yet to address this specific comity issue. However, it goes without saying that we expect our pronouncements will be the final word within the Ninth Circuit's geographical area, subject only to en banc or Supreme Court review. *See Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 482 (9th Cir. 1994). Our federal judicial system requires that when the Supreme Court issues an opinion, its pronouncements become law of the land. *See Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). Similarly, when the Ninth Circuit or any of its coequal circuit courts issue an

---

[5]The dissent asserts that AMC did not raise the doctrine of comity. However, AMC raised the issue to the district court in the summary judgment proceedings. The district court rejected AMC's argument finding that "The *Lara* decision imposed no legal obligation on AMC. . . . Therefore, AMC would not be faced with a choice between complying with this Court's orders and the *Lara* court's orders." *United States v. AMC Entertainment, Inc.*, 232 F. Supp. 2d 1092, 1115 (C.D. Cal. 2002). Appellee argues that AMC waived its argument that the remedial order should have excluded the Fifth Circuit, because it did not argue it in the remedial stage. However, one would not expect AMC to continue to raise issues that the court already determined. Further, even if AMC were required to raise this specific issue in its remedies briefing and did not, it does not preclude this court's review of AMC's comity contention. This court always has discretion to consider comity *sua sponte*. *See Stone v. City and County of San Francisco*, 968 F.2d 850, 855-56 (9th Cir. 1992); *see also Church of Scientology of California v. United States Dep't. of Army*, 611 F.2d 738, 749 (9th Cir. 1979) ("When considering issues raised by the comity doctrine . . . courts are not bound by technicalities.").

opinion, the pronouncements become the law of that geo-graphical area. *See Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) (noting that district courts are "bound by the law of their own circuit," and "are not to resolve splits between circuits . . . .") (citations omitted). In instances where the circuits do not agree on the interpretation of a statute or a regulation, those disagreements should be resolved by the Supreme Court.

**[6]** Based upon this judicial hierarchy, we must be mindful of the decisions of our sister circuits, when we make decisions in cases affecting litigants' legal rights and remedies in the geographic boundaries of their circuits. For example, in *Railway Labor Executives' Ass'n v. I.C.C.*, 784 F.2d 959 (9th Cir. 1986), we held that a party was not collaterally estopped from relitigating the scope of a federal regulation due to the Tenth Circuit's decision on the issue. We stated that "[t]he courts do not require an agency of the United States to accept an adverse determination of the agency's statutory construction by any of the Circuit Courts of Appeals as binding on the agency for all similar cases throughout the United States." *Id.* at 964. We did note, however, that the review would have limited geographic impact: "[i]t is standard practice for an agency to litigate the same issue in more than one circuit and to seek to enforce the agency interpretation selectively on persons subject to the agency's jurisdiction *in those circuits where its interpretation has not been judicially repudiated.*" *Id.* (emphasis added).

We similarly considered the effect of an injunction that " 'would impugn foreign law' or be an 'interference with the sovereignty of another nation' " in *Las Palmas Food Co. v. Ramirez & Feraud Chili Co.*, 146 F. Supp. 594, 602 (S.D. Cal. 1956), *adopted and summarily aff'd*, 245 F.2d 874 (9th Cir. 1957). There, we adopted as our own a district court decision enjoining American citizens from appropriating the trade name of an American corporation for use in Mexico. *See id.* at 598-99. In *Las Palmas*, the plaintiff asserted a claim under

the Lanham Act for infringement and unfair competition in use of plaintiff's trade-mark and trade name. *Id.* at 597. In reviewing the issue of comity, the district court, determined that (1) "there [w]ould be no affront to Mexican sovereignty or Mexican law," (2) "plaintiff does not seek a determination that any act of a foreign sovereign is invalid," and (3) "plaintiff [does not] ask this court to negate something that has already been determined in adversary proceedings between parties at bar in a foreign forum." *Id*. at 602. Only after making these findings did the court conclude that comity would not prevent the exercise of the court's jurisdictional power. *Id.*

Our sister circuits have similarly respected another circuit's ability to disagree. For instance, in *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379 (4th Cir. 2001), the Fourth Circuit refused to issue a nationwide injunction of a Federal Election Commission (FEC) regulation that would "prevent[ ] the FEC from enforcing the regulation against any party anywhere in the United States." *Id.* at 393. The Fourth Circuit reasoned: "The injunction also encroaches on the ability of other circuits to consider the constitutionality of [the regulation]." *Id*. "Such a result conflicts with the principle that a federal court of appeal's decision is only binding within its circuit." *Id.*

**[7]** Likewise, in *Carson v. Here's Johnny Portable Toilets, Inc.*, 810 F.2d 104 (6th Cir. 1987), Johnny Carson brought suit against a Michigan corporation engaged in renting and selling portable toilets under the name "Here's Johnny." *Id*. at 105. The Sixth Circuit held that Carson's state law "right of publicity" had been violated, and affirmed the nationwide injunction. *Id*. The Court held that (1) where there are indications that other jurisdictions may hold as our court would hold and (2) where there are no facts in the record to suggest that the party would encounter the contrary precedent, it would allow a nationwide injunction. *Id*. The Sixth Circuit, in *Herman Miller, Inc. v. Palazzeti Imports and Exports, Inc.*, 270 F.3d 298 (6th Cir. 2001), applied the factors set forth in *Car-*

*son* and held that the district court abused its discretion by extending the right of publicity to states that do not recognize that right. *Id.* at 327. The court noted "[t]he issuance of an injunction under state law prohibiting otherwise lawful conduct in another state raises serious concerns. Thus, although a court may have jurisdiction to grant broad relief, an injunction protecting the right of publicity should ordinarily be limited to conduct in jurisdictions that provide protection comparable to the former state." *Id.* (quoting Restatement (Third) of Unfair Competition § 48 cmt. c (1995)) (emphasis omitted).

[8] Here, the district court's injunction is not a reasonable extension of Fifth Circuit precedent. Instead, the district court specifically requires conduct by AMC in the Fifth Circuit's geographic area that the Fifth Circuit rejected until the Access Board and the DOJ promulgated specific regulatory guidelines. Therefore, not only does the Fifth Circuit not require such conduct, it specifically "judicially repudiated" these DOJ/Access Board requirements of the citizens of its circuit (when considering the same arguments the district court now enforces in its injunction). *See Railway Labor*, 784 F.2d at 964. A district court in the Ninth Circuit should not "negate something that has already been determined in adversary proceedings" before the United States Court of Appeals of the Fifth Circuit. *See Las Palmas*, 146 F. Supp. at 602. The Fifth Circuit specifically rejected the "lines of sight" argument stating:

> In light of the lack of any evidence that the Access Board intended section 4.33.3 to impose a viewing angle requirement, the Board's recent statement that it had not yet decided whether to adopt the DOJ's litigating position with respect to stadium-style theaters, and the common meaning of "lines of sight," we cannot conclude that the phrase "lines of sight comparable" requires anything more than that theaters provide wheelchair-bound patrons with unob-

structed views of the screen. To impose a viewing angle requirement at this juncture would require district courts to interpret the ADA based upon the subjective and undoubtedly diverse preferences of disabled moviegoers. Congress granted the DOJ, in conjunction with the Access Board, the authority to promulgate regulations under the ADA in order to provide the owners and operators of places of public accommodation with clear guidelines for accommodating disabled patrons. . . . Accordingly, in the absence of specific regulatory guidance, we must hold that section 4.33.3 does not require movie theaters to provide disabled patrons with the same viewing angles available to the majority of non-disabled patrons.

*Lara,* 207 F.3d at 789 (internal citations omitted). To this date (and *Lara* was decided in April 2000), the Access Board and the Department of Justice have proposed no additional regulatory guidance. Thus, the district court's injunction is in direct conflict with the Fifth Circuit's precedent, not a reasonable extension of it.

**[9]** We find the reasoning set forth in *Railway Labor*, *Virginia*, *Carson*, *Herman Miller*, and *Las Palmas* instructive, and apply it here. Principles of comity require that, once a sister circuit has spoken to an issue, that pronouncement is the law of that geographical area. Courts in the Ninth Circuit should not grant relief that would cause substantial interference with the established judicial pronouncements of such sister circuits. To hold otherwise would create tension between circuits and would encourage forum shopping. Thus, we hold the district court abused its discretion in issuing the nationwide injunction affecting the geographical area of the Fifth Circuit and, therefore, the actions of AMC within that circuit.**[6]**

---

**[6]**We note AMC did not raise its comity contention to the district court at the remedies phase of the litigation. However, this court has discretion to raise comity *sua sponte*. *See Stone v. City and County of San Francisco*, 968 F.2d 850, 855-56 (9th Cir. 1992).

## III.   CONCLUSION

**[10]** Because the government failed to give AMC fair notice as to the requirements of § 4.33.3, until, at the earliest, the DOJ's publication of its amicus brief in *Lara*, due process requires that AMC may not be held accountable for actions undertaken prior to the date on which it received fair notice. Further, a majority of this panel holds that because the Fifth Circuit has endorsed a different interpretation of § 4.33.3, principles of comity prevent the district court from fashioning a nationwide injunction that dictates AMC's conduct within the Fifth Circuit. We therefore vacate the district court's remedial order and remand for a (1) determination of the precise date on which AMC received fair notice and (2) modification of the remedial order consistent with due process and comity requirements.

**REVERSED and REMANDED.**

---

WARDLAW, Circuit Judge, dissenting in part:

I respectfully dissent from Part II.C of the majority opinion.[1] In crafting a remedy that was no broader than necessary to address AMC's violations of § 4.33.3, the district court did not abuse its discretion.[2] On the contrary, the district court properly followed the Supreme Court's instruction that no conflict exists, for the purposes of comity analysis, "where a

---

[1]I agree with the majority that AMC did not waive its right to appeal the nationwide scope of the injunction by participating in fashioning the injunctive relief as ordered by the district court, and do not dissent from that ruling. However, the majority bases its reversal of the district court on an argument—comity—that AMC never raised to the district court, but which the majority now erroneously views as pivotal.

[2]We review the scope of a district court's remedial order for an "abuse of discretion." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1493 (9th Cir. 1996).

person subject to regulation by two states can comply with the laws of both." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993) (internal quotation marks omitted). Disregarding the absence of a "true conflict" that implicates comity concerns, *see id.* at 798, the majority concludes that a nationwide injunction against AMC "would cause substantial interference" with the sovereignty of the Fifth Circuit, and that consequently the district court abused its discretion in granting such relief. I cannot agree.

## I.   The Appropriate Scope of Injunctive Relief

It is well-established that once a court has obtained personal jurisdiction over a defendant, that court has the power to command the defendant to perform acts outside the territorial jurisdiction of the court. *See New Jersey v. City of New York*, 283 U.S. 473, 482 (1931) ("The situs of the acts creating the nuisance, whether within or without the United States, is of no importance. Plaintiff seeks a decree in personam to prevent them in the future. The Court has jurisdiction."); *accord Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) (holding that an injunction may reach activities taking place in Mexico); *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451-52 (1932) (holding that a district court's decree is binding "throughout the United States").

We have often reiterated this principle. *See, e.g.*, *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987) ("[T]here is no bar against . . . nationwide relief in federal district or circuit court when it is appropriate."); *United States v. Oregon*, 657 F.2d 1009, 1016 n.17 (9th Cir. 1982) (holding that a district court "may enjoin the commission of acts outside its district"). Just last year, we upheld a nationwide injunction setting aside certain Forest Service regulations that were "manifestly contrary" to the Forest Service Decisionmaking and Appeals Reform Act. *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 698-99 (9th Cir. 2007).

Likewise, district courts within our circuit commonly issue nationwide injunctions where the "injunction . . . is tailored to the violation of law that the Court already found—an injunction that is no broader but also no narrower than necessary to remedy the violations." *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 468 F. Supp. 2d 1140, 1144 (N.D. Cal. 2006); *see also Golden Door, Inc. v. Odisho*, 437 F. Supp. 956, 968 (N.D. Cal. 1977), *aff'd*, 646 F.2d 347 (9th Cir. 1980), *abrogated on other grounds by Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866 (9th Cir. 2002) ("Plaintiff's market area, and hence the sphere of its reputation, are nationwide. Accordingly, it is entitled to nationwide protection against confusion and dilution. The scope of the injunction must therefore be nationwide.").[3]

---

[3]In point of fact, other circuit courts also regularly countenance nationwide relief under federal law, often without reference to the law of their sister circuits. *See, e.g.*, *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 523-27 (11th Cir. 2006) (finding a nationwide "pattern or practice" of violating 17 U.S.C. § 119(a)(7)(B) and granting a nationwide injunction against such activity); *JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 359 F.3d 699, 701 (4th Cir. 2004) (considering potential violations of a nationwide injunction issued to enforce IRS regulations); *United States v. Dinwiddie*, 76 F.3d 913, 929 (8th Cir. 1996) (holding that where "a geographically narrow injunction would be insufficient to advance" the government's "significant interest" in nationwide relief, "the nationwide scope of the injunction is constitutional"); *Washington v. Reno*, 35 F.3d 1093, 1103-04 (6th Cir. 1994) ("[T]he appropriate relief to be granted to the plaintiffs on their . . . claim necessarily implicates nationwide relief."); *McLendon v. Cont'l Can Co.*, 908 F.2d 1171, 1182 (3d Cir. 1990) ("It cannot be gainsaid that Continental has employed a liability avoidance program [("LAP")], illegal wherever it is used. Full relief required a nationwide injunction ordering Continental to cease its use of this discriminatory LAP."); *see also Stiller v. Hardman*, 324 F.2d 626, 628 (2d Cir. 1963) ("The mandate of an injunction issued by a federal district court runs throughout the United States."); 5 J. Thomas McCarthy, *McCarthy On Trademarks and Unfair Competition* § 30:15 (4th ed. 2008) ("It is a familiar rule of Anglo-American law that once a court has obtained personal jurisdiction over a defendant, the court has power to command the defendant to do or not do acts outside the territorial jurisdiction of the court.").

Ultimately, the appropriate scope of injunctive relief is guided by "the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979) (revisiting equitable principles in light of class action lawsuits). Thus, "principles of equity" limit the scope of injunctions to "the extent of the violation established, not by the geographical extent of the plaintiff class." *Id*. Our circuit assesses the appropriateness of the relief fashioned by referencing the test set by *Califano*: "The primary concern . . . must be that the relief granted is not 'more burdensome than necessary to redress the complaining parties.' " *Bresgal*, 843 F.2d at 1170 (quoting *Califano*, 442 U.S. at 702).

Consistent with these principles, we have held that a district court abuses its discretion when it enjoins activities beyond what is necessary to address the actual case before the court. *See Meinhold v. U.S. Dep't of Defense*, 34 F.3d 1469, 1480 (9th Cir. 1994). Addressing the complaint of a lone U.S. Navy serviceman who was discharged for stating he was gay, the district court had issued an injunction preventing the Department of Defense ("DOD") from discharging *anyone* based on sexual orientation and from maintaining files on the sexual orientation of servicemen "in the absence of conduct affecting the military mission." *Id*. at 1472. Applying *Califano*, we found the injunction overbroad, reasoning: "This is not a class action, and Meinhold sought only to have his discharge voided and to be reinstated. . . . Beyond reinstatement, and not separating Meinhold on that basis, DOD should not be constrained from applying its regulations to Meinhold and all other military personnel." *Id*. at 1480. Accordingly, we vacated all aspects of the injunction addressing issues beyond Meinhold's reinstatement. *Id*.

These principles are beyond any real dispute. Moreover, it is clear that, following these principles, the district court appropriately tailored its injunction so that it was "no more burdensome" to AMC "than necessary to provide complete

relief" to the DOJ. *Id.* (internal quotation marks omitted). The majority apparently does not disagree.

## II.  Relevant Comity Concerns

My disagreement with my colleagues arises from their view that because our circuit and the Fifth Circuit embrace distinct interpretations of § 4.33.3, the nationwide injunction implicates principles of comity. The error in their analysis is that they focus on the wrong "conflict." The critical issue is not that the Ninth and Fifth Circuits have announced different interpretations of § 4.33.3—the Ninth requiring comparable viewing angles and the Fifth merely an unobstructed view of the screen. Rather, the issue is whether AMC's compliance with the nationwide injunction would require it to act in conflict with any law, obligation, or requirement in the Fifth Circuit or Texas. It would not.

The Fifth Circuit certainly has every right to interpret law governing those states within its territory inconsistently with our view of the same law. However, I do not see—and the majority does not explain—how the district court's remedial order impairs the Fifth Circuit's power to do so. Specifically, nothing in a nationwide injunction against AMC could possibly threaten the independence or sovereignty of the Fifth Circuit, and it is simply incorrect to assert, as the majority does, that the injunction "requires conduct by AMC in the Fifth Circuit's geographic area that the Fifth Circuit rejected." Under the injunction, as the district court noted in its summary judgment order, "AMC would not be faced with a choice between complying with this Court's orders and the [Fifth Circuit]'s orders." Were the nationwide injunction to issue, the law in the Fifth Circuit would remain unchanged, and all persons in the Fifth Circuit would remain bound by its statement of the law. Nor would AMC's remedial actions violate or undermine the Fifth Circuit's interpretation of § 4.33.3. In *Lara v. Cinemark USA, Inc.*, 207 F.3d 783 (5th Cir. 2000), the Fifth Circuit held that, at a minimum, § 4.33.3 requires theaters to

provide an unobstructed view for disabled spectators. *See id.* at 789. Requiring AMC to provide an even *better* viewing angle—not just unobstructed, but also comparable—does not create a conflict, and it is clear that AMC could remodel its theaters on its own initiative without violating the Fifth Circuit's interpretation of § 4.33.3.[4]

In the international context, the Supreme Court has spoken clearly to what constitutes a cognizable comity conflict. *Hartford Fire* presented the question of whether comity permitted a U.S. district court to consider certain Sherman Act antitrust claims against a group of London reinsurers. 509 U.S. at 778-79. Regarding comity, the Court framed the only "substantial question" as "whether there is in fact a true conflict between domestic and foreign law." *Id.* at 798 (internal quotation marks omitted). The London reinsurers, joined by the British Government as amicus curiae, argued that comity counseled against the district court's exercise of jurisdiction, because the British Parliament had "established a comprehensive regulatory regime . . . and . . . the conduct alleged here was perfectly consistent with British law and policy." *Id.* at 798-99. The Court rejected this argument, stating that the "fact that conduct is lawful in the state in which it took place will not, of itself, bar application of the United States antitrust laws, even where the foreign state has a strong policy to permit or encourage such conduct." *Id.* at 799 (internal quotation marks omitted). The Court explained: "No conflict exists, for these purposes, where a person subject to regulation by two states can comply with the laws of both." *Id.* (internal quotation marks omitted).

---

[4]The litigating position that has been consistently advanced by the DOJ in the years since *Lara* was decided provides sufficient "specific regulatory guidance" to cast doubt upon *Lara*'s continuing viability. *See Lara v. Cinemark USA, Inc.*, 207 F.3d 783, 788-89 (5th Cir. 2000) (resting its holding on the "absence of specific regulatory guidance"). That is a question for courts within the Fifth Circuit; regardless of the answer, a nationwide injunction against AMC is appropriate.

*Hartford Fire* provides clear support for the district court's issuance of a nationwide injunction against AMC. Since the AMC defendants cannot show that "[Fifth Circuit] law requires them to act in some fashion prohibited by the law of the [Ninth Circuit] or . . . that their compliance with the laws of both [circuits] is otherwise impossible," the district court's remedial order does not create a conflict that implicates comity concerns. *Id.*; *see also In re Simon*, 153 F.3d 991, 999 (9th Cir. 1998) (confirming that "general principles of international comity" are "limited to cases in which there is in fact a true conflict between domestic and foreign law" (internal quotation marks omitted)).

### III.    The Majority Cannot Cite a Single Case Supporting Its Position

Though courts in our circuit and elsewhere frequently issue and approve nationwide injunctions, the majority fails to identify a single, relevant case that suggests the injunction against AMC was an abuse of discretion. In fact, most of the cases the majority relies on actually support the conclusion that nationwide relief was appropriate here, while the others are strikingly inapposite.

*Bulova* was a Lanham Act case in which the Supreme Court concluded a federal district court had jurisdiction to enjoin trademark infringement consummated in Mexico by a U.S. resident. 344 U.S. at 281-82, 289. The Supreme Court first stated that it did not doubt "the District Court's jurisdiction to award appropriate injunctive relief if warranted by the facts after trial," although the infringing conduct was permitted under Mexican law. *Id.* at 289. The Court also noted that a Mexican court had nullified a potentially conflicting registration of the counterfeit "Bulova" trademark in Mexico. *Id.* Concluding that there could be "no interference with the sovereignty of another nation," the Supreme Court held that "the District Court in exercising its equity powers may command

persons properly before it to cease or perform acts outside its territorial jurisdiction." *Id.*

In *Las Palmas Food Co. v. Ramirez & Feraud Chili Co.*, 245 F.2d 874 (9th Cir. 1957) (per curiam), *aff'g and adopting by reference Ramirez & Feraud Chili Co. v. Las Palmas Food Co.*, 146 F. Supp. 594 (S.D. Cal. 1956), *cert. denied*, 355 U.S. 927 (1958), our circuit took up a question *Bulova* left open.[5] Like *Bulova*, *Las Palmas* was a Lanham Act suit for injunctive relief against the infringement of a plaintiff's trademark and trade name in Mexico. *See Las Palmas*, 146 F. Supp. at 597-98. Unlike *Bulova*, however, the *Las Palmas* defendants had a valid Mexican registration of their counterfeit copy of the trademark. *Id.* at 598. The defendants argued that although the district court had the power to grant injunctive relief in Mexico, comity demanded that the court "should abstain from exercising that power because to do so would offend the sovereignty of the Republic of Mexico." *Id.* at 602. Rejecting this argument, we noted that "at the most defendants' Mexican registration of plaintiff's mark can have no greater effect than to confer upon defendants a license or permission to use the mark in Mexico." *Id.* We reasoned that since no "public policy of Mexico requires defendants ever to exercise that license," forbidding use of the license would cause "no affront to Mexican sovereignty or Mexican law." *Id.*

Under *Bulova* and *Las Palmas*, the district court was well within its discretion in issuing a nationwide injunction against AMC. In fact, each of the specific factors the *Las Palmas* court considered supports the propriety of nationwide relief. First, just as the law of Mexico did not require the *Las Palmas* defendants to exercise their counterfeit license, the law of the Fifth Circuit does not prevent AMC from providing comparable viewing angles in its theaters, such that the nationwide

---

[5]When we adopt an opinion of the district court as our own, that opinion becomes relevant precedent on the issues it decides. *See, e.g.*, *In re Gardenhire*, 209 F.3d 1145, 1148 (9th Cir. 2000).

injunction causes no affront to Fifth Circuit law. *See id.*; *see also Bulova*, 344 U.S. at 289 (finding "no conflict which might . . . impugn foreign law"). Moreover, surely no public policy of the Fifth Circuit requires that theater owners refrain from providing comparable viewing angles to disabled patrons, such that requiring AMC to do so would affront the Fifth Circuit's sovereignty. *Cf. Las Palmas*, 146 F. Supp. at 602. Second, the *Las Palmas* court "emphasized that plaintiff does not seek a determination that any act of a foreign sovereign is invalid." *Id.* Similarly, the DOJ does not seek to overturn the Fifth Circuit's interpretation of § 4.33.3. Finally, the *Las Palmas* plaintiff, like the DOJ, did not "ask this court to negate something that has already been determined in adversary proceedings between the parties at bar in a foreign forum." *Id.* Accordingly, to the extent that *Bulova* and *Las Palmas* guide our analysis, we should conclude that "comity does not here argue against exercise of the power which the Congress has conferred," *id.*, and the district court did not abuse its discretion.

Nor would a nationwide injunction against AMC "encroach[ ] on the ability of other circuits to consider" how to construe § 4.33.3. *Va. Soc'y for Human Life v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001). In *Virginia Society*, an issue advocacy group sued the Federal Election Commission ("FEC") seeking a declaration that a particular regulation was unconstitutional. *Id.* at 381. The district court found the regulation unconstitutional and issued a nationwide injunction preventing the FEC from enforcing the regulation. *Id.* Finding the injunction overbroad, the Fourth Circuit remanded for modification on two grounds: First, the injunction was "broader than necessary to afford full relief" to the plaintiff, as an injunction preventing enforcement of the regulation against the plaintiff alone would have "adequately protect[ed] it from the feared prosecution." *Id.* at 393. Second, the injunction had "the effect of precluding other circuits from ruling on the constitutionality" of the regulation. *Id.* Both *Virginia Society* factors weigh in favor of a nationwide injunc-

tion against AMC, as there would be no encroachment on the ability of other circuits to construe § 4.33.3, and the injunction would only apply to AMC—not to "any party anywhere." *Id.* Thus, to the extent *Virginia Society* is persuasive, it too supports the grant of nationwide relief.

The majority's reliance on *Railway Labor Executives' Ass'n v. Interstate Commerce Commission*, 784 F.2d 959 (9th Cir. 1986), is also misplaced. The Railway Labor Executives' Association ("RLEA") challenged the Interstate Commerce Commission's ("ICC") interpretation of the interplay between 49 U.S.C. § 10901 and § 10903. *See id.* at 961-63. The ICC claimed that only § 10901 governed its approval of the sale of a particular railway line to a noncarrier, such that any labor protections it might impose as a condition of its approval were discretionary, while the RLEA claimed that § 10903 interposed mandatory employee protections as a condition of the sale. *Id.* at 964. Before reaching the merits, we addressed the claim that collateral estoppel precluded our review because the RLEA had already raised—and lost—arguments on "this very legal issue" before the Tenth Circuit. *Id.* Assuming for the purpose of argument "the strict similarity" of the cases, we held that collateral estoppel did not bar RLEA from making its arguments before us, because the "employees whose interests RLEA seeks to protect here are not the same people whose interests it sought to protect in the Tenth Circuit case." *Id.* Thus, there was "no mutuality of estoppel." *Id.* Similarly, the theaters governed by the nationwide injunction against AMC are not the same theaters whose accommodations were considered in *Lara*. More fundamentally, the DOJ was not a party to *Lara*, but merely filed an amicus brief, so principles of estoppel do not apply.

*Railway Labor* does acknowledge the widespread principle that the government may relitigate the same issue in different circuits. *See id.* As we noted there, "[i]t is standard practice for an agency to litigate the same issue in more than one circuit and to seek to enforce the agency's interpretation selec-

tively on persons subject to the agency's jurisdiction in those circuits where its interpretation has not been judicially repudiated." *Id.*; *see also Va. Soc'y*, 263 F.3d at 394 (declining to set aside an FEC regulation under the Administrative Procedure Act because then the "FEC would no longer be allowed to defend its regulation in front of other courts of appeals"). However, while certain agencies may selectively relitigate issues, collateral estoppel generally prevents private parties from doing so. As the Supreme Court has explained, this distinction reflects a longstanding recognition that "the Government is not in a position identical to that of a private litigant, both because of the geographic breadth of government litigation and also, most importantly, because of the nature of the issues the government litigates." *United States v. Mendoza*, 464 U.S. 154, 159 (1984) (internal citations and quotation marks omitted) (refusing to apply nonmutual collateral estoppel to the government). Specifically, preventing the government from relitigating issues "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue," among other concerns. *Id.* at 160-61. The same cannot be said of private parties.

The majority emphasizes *Railway Labor*'s recognition of the government's ability to relitigate issues, but misconstrues its significance. The prepositional phrase "in those circuits where its interpretation has not been judicially repudiated" refers to the location of selective enforcement, not the scope of the remedy. Thus, the DOJ appropriately came to our circuit to enforce § 4.33.3 against AMC. A nationwide injunction against AMC remains the appropriate remedy, provided the injunction is tailored to the scope of the harm and compliance with the injunction would not force AMC to violate the law of another state or circuit. Accordingly, *Railway Labor* provides no indication that the district court abused its discretion by granting the DOJ nationwide relief.[6]

---

[6]Although collateral estoppel does not apply to the current suit between DOJ and AMC, it is possible that further litigation between the parties

The majority's reliance upon *Carson v. Here's Johnny Portable Toilets, Inc.*, 810 F.2d 104 (6th Cir. 1987) (per curiam), is somewhat perplexing. There, the Sixth Circuit conditionally approved the issuance of a nationwide injunction based on Michigan's state law "right of publicity." *Id.* at 105. The question before the Sixth Circuit was whether an injunction addressing violations of Michigan's state law could extend beyond Michigan's borders when it was unclear whether other states maintained similar substantive protections. Despite such concerns, the Sixth Circuit allowed the injunction, reasoning:

> Because there are indications that other states would hold as we have predicted Michigan would, and because the defendant is uncertain, at this point, whether it wants to use the phrase "Here's Johnny" in any state where the substantive law arguably differs from Michigan's, we see no harm in letting the injunction stand in its present form for the time being, at least.

*Id.* Critical to the Sixth Circuit's holding was the fact that if "the defendant should hereafter decide that it wants to use the phrase in a state (other than Michigan) where it believes such use would be legal but for the injunction, it will be free to seek a modification of the injunction." *Id.* By predicting the probable trend of the law nationally, the Sixth Circuit was not adopting a requirement that the right must reasonably extend to other states in order for a nationwide injunction to issue.

---

regarding § 4.33.3 would indeed be barred. *See United States v. Stauffer Chem. Co.*, 464 U.S. 165, 169 (1984) (holding that "the doctrine of mutual defensive collateral estoppel is applicable against the government to preclude relitigation of the same issue already litigated against the same party in another case involving virtually identical facts."). Given that collateral estoppel could prevent the DOJ from enforcing § 4.33.3 against AMC in the future, a nationwide injunction against AMC appears particularly appropriate.

Rather, it merely observed that, as it saw "the equities, . . . it would be fairer to require the defendant to take the litigation initiative . . . than to require the plaintiffs to do so." *Id.*

The Sixth Circuit was justifiably wary of permitting an injunction that would dictate behavior in other states on the basis of one state's tort law. Our federal courts have long stood by the principle that the "common law so far as it is enforced in a State, whether called common law or not, is not the common law generally but the law of that State existing by the authority of that State without regard to what it may have been in England or anywhere else." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938) (internal quotation marks omitted). However, while "[c]ircuit law . . . binds all courts within a particular circuit, including the court of appeals itself," *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001), the courts of appeal do not "retain a residuary and inviolable sovereignty" comparable to that of the States. *Alden v. Maine*, 527 U.S. 706, 715 (1999) (internal quotation marks omitted) (discussing state sovereign immunity); *see also Stauffer Chem. Co.*, 464 U.S. at 176 (White, J., concurring) ("[T]here are considerations of comity in the state/federal situation that are not present as between two circuits."). On the contrary, the circuit courts share the responsibility of interpreting a common body of constitutional and federal law, and must render decisions that are consistent with the Supreme Court's statement of the law. *See Massanari*, 266 F.3d at 1171 ("A decision of the Supreme Court will control that corner of the law unless and until the Supreme Court itself overrules or modifies it. Judges of the inferior courts may voice their criticisms, but follow it they must."). The nationwide injunction against AMC does not implicate the federalism and state sovereignty concerns at issue in *Here's Johnny*. Unlike Michigan's right of publicity, § 4.33.3 is a federal regulation that is as applicable in the Fifth Circuit as it is in the Ninth. For that reason, the Sixth Circuit's reasoning in *Here's Johnny* does not apply here.

In light of the "considerable discretion" a district court has "in fashioning suitable relief and defining the terms of an injunction," our precedent commands "correspondingly narrow" appellate review. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (internal quotation marks omitted). Unfortunately, the majority's review is far from narrow. Instead, based on a tenuous apprehension of "substantial interference" with the law of the Fifth Circuit, the majority vacates the district court's injunction without ever explaining how that remedial order was an abuse of discretion. Because the district court's injunction did not exceed the specific harm alleged, it cannot have been overbroad. *See id.*; *see also Bresgal*, 843 F.2d at 1170-71 ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." (emphasis omitted)). Moreover, because the relevant comity cases actually support the scope of the district court's injunction, it is clear that the district court did not rely on erroneous legal principles. Confronting AMC's nationwide violations of § 4.33.3, and keeping in mind the ADA's stated purpose "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), the district court was well within its discretion in granting nationwide relief. Thus, I dissent.